[No. A085459. First Dist., Div. Two. Oct. 26, 2000.]

JOY ORIOLA, Plaintiff and Appellant, v.
ADAM THALER, Defendant and Respondent.

COUNSEL

Nihonmachi Legal Outreach and Judy B. Louie for Plaintiff and Appellant.

Rogers, Joseph, O'Donnell & Quinn and Sean M. SeLegue for Defendant and Respondent.

OPINION

**KLINE, P. J.**—Joy Oriola appeals from an order dismissing her application for a restraining order against Adam Thaler for lack of jurisdiction under the

Domestic Violence Prevention Act (DVPA or the Act) (Fam. Code, § 6200 et seq.). The Act extends protection to individuals who are or have been in certain relationships with the perpetrator of defined types of abuse, including "a dating or engagement relationship." (Fam. Code, § 6211, subd. (c).) Appellant contends the trial court erred in finding there was no "dating relationship" between her and respondent.

The sole legal question this case presents, which is considerably more difficult than it may first appear, is the meaning of the phrase "dating relationship" as used in the DVPA.

### STATEMENT OF THE CASE AND FACTS

On August 7, 1998, appellant filed an application for a restraining order against respondent under the DVPA. In her application, appellant indicated that she and respondent had had a "dating or engagement relationship"; that respondent had "caused, threatened, or attempted bodily injury to [her] or another member of [her] household," "made [her] or another member of [her] household afraid of physical or emotional harm," and "stalked" her. She requested restraining and stay-away orders, including staying away from the gym facility to which the parties belonged, as well as attorney fees and reimbursement for gym expenses of $733.20 and lost wages of $1,680.

In the declaration accompanying her application, appellant stated that she first met appellant during the fall of 1996, at the 24-hour Nautilus gym where they were both members. In November 1996, the parties began to have conversations at the gym and to exchange e-mail correspondence. Initially, the two were attracted to one another. In December, appellant invited respondent to attend a concert with a group of her friends; however, during that occasion she realized she was not interested in him romantically and the next day, over the telephone, told him she just wanted to be friends. She continued to see respondent at the gym and talk to him on the phone. He told her he had recently moved to San Francisco and did not have many friends in the area, and described his break-up with a girlfriend of several years. She told him she would introduce him to some of her friends and other people their age to "expand his associations." Over the Christmas holiday, appellant invited respondent to her family's Christmas dinner. After respondent complained that they always went out with other people and expressed a desire for the two to go out alone, they went together to a Sunday brunch at which respondent talked constantly about his ex-girlfriend and "how alone he felt." A week later, appellant invited respondent to a friend's party in order to introduce him to other people.

According to appellant's declaration, several days after the party, respondent indicated appellant did not spend enough time with him or make time

for him as she did for her other friends. He said, "I don't know what I'd do if you started dating another man." She reminded him she was not interested in establishing a romantic relationship and told him she would be happy to listen if he needed to talk but did not think they should "hang out" anymore. For the next several weeks, respondent repeatedly telephoned appellant at home, sometimes talking about how lonely he felt and sometimes relating how upset he was that she did not want to "hang out" with him. The calls turned into arguments and appellant told respondent they should cut off their friendship and he should not call her. For several days, respondent called, crying and upset with appellant for terminating their friendship. From January 1997 through the summer of 1997, respondent "crank called" appellant. She saw him at the gym but did not talk to him. In the summer, he called her at work and said, "I'm so angry. You're very disrespectful. You're weak." She asked what she could do to make him stop being angry and he said, "I won't stop being angry at you until you no longer exist." On two occasions, respondent followed appellant when she left the gym to take public transportation, although this was not his regular mode of travel.

From late December 1997 through March 1998, appellant received 25 to 40 "crank calls and hang up calls" per day from respondent, mostly after he saw her at the gym. In February 1998, while the parties were at the gym, appellant inquired how respondent was doing, and he told her, "shut the fuck up." She told him he had to "stop doing this" and "[i]f you try intimidating me, it would be harassment." In March, respondent followed appellant into the sauna at the gym, giving her dirty looks. After others in the sauna left, respondent began to "hit the bench and bang the walls with his shoulders and elbows." Appellant told him if he did this again she would assume he was physically threatening her; he hit the walls and bench again. She told him she would report him to the management and he again hit the wall and bench. She reported the matter to the manager. In late March, respondent paged some 45 individuals and left them appellant's cell phone and work numbers. Also in late March, respondent called appellant at work; when she told him she would take action if he did not stop bothering her, he said, "I have nothing to lose, you asshole."

Afraid respondent would continue to threaten her and might hurt her, appellant made a police report against appellant in early April 1998. She avoided the gym from April until mid-June and then, having not seen respondent for 11 weeks, hoped he would no longer threaten or harass her. On June 15, she went to the gym; respondent was there but did not talk to her. From June 16 until June 30, she received approximately 25 "crank calls" daily. On or about June 30, appellant received an "e-mail bomb" with

approximately 263 messages resulting from appellant's e-mail address having been subscribed to receive crop, livestock and United States Department of Agriculture reports from all 50 states. The overload "created a potential shutdown" at appellant's workplace. Subsequent investigation revealed the e-mail "bomb" had been sent from respondent's computer at his place of employment.

The initial police report reflecting appellant's complaint of harassment and threats described appellant as having "be-friended" respondent and explained to him that she was not interested in him "outside of a platonic relationship," and reported that appellant "stated there was only a platonic relationship between [respondent] and herself." This report listed appellant as the suspect's girlfriend. In a subsequent police department incident report statement, appellant sought to correct "errors" in the prior report, including that the "reporting party relationship is 'acquaintance,' not 'girlfriend.' "[1]

In a supplemental declaration in support of her application for restraining orders, appellant stated that she had never been respondent's "girlfriend" but did "briefly date" him. Appellant explained that when, after the concert date, she told respondent she was not interested in him romantically, she still found him attractive and entertained the possibility they could "continue to go out together." She decided to go out with him a few more times to decide how she felt about him, but after he became "very possessive of [her] time and [her] space" realized she did not want a relationship with him and told him they should have no further contact. When respondent began to harass and threaten her, she felt embarrassed that she had been attracted to him and felt uncomfortable with the description of her in the police report as respondent's girlfriend. She asked for correction of the report because she did not want respondent to assume their relationship "had reached that level."[2]

Respondent took the position that the application should be denied because a "platonic relationship" with an "acquaintance" did not amount to a "dating or engagement relationship" within the meaning of the DVPA; that the restraining orders sought were overbroad; and that the monetary relief appellant sought exceeded that available under the DVPA. Respondent sought attorney fees and restitution for vacation and sick leave he used after being served with appellant's application at his place of work, without warning, in a humiliating manner.

---

[1]Appellant also corrected the prior report's erroneous statement that the parties' first contact was in December 1996 rather than December 1997.

[2]Appellant's supplemental declaration was dated August 25 and filed on August 28. According to the declaration of respondent's attorney, appellant's supplemental declaration was filed after he proposed informal resolution of the matter to appellant's attorney.

Respondent's declaration stated his recognition of appellant's desire to have no contact with him and his intention to honor that request. According to respondent, when he began exchanging e-mails with appellant in the summer of 1996, he had a girlfriend of more than four years and was not looking to date anyone else. He and his girlfriend broke up in November 1996. In December, appellant invited respondent to join a group attending a concert; in a subsequent conversation, respondent told appellant about his break-up and said he "could really use a friend." Appellant spoke about other men she was dating. Respondent stated that he and appellant "expressly agreed to be 'friends.' " At appellant's family Christmas dinner, when someone told the parties to move closer together for a picture, appellant said, "No, we're just friends." Respondent's declaration stated his desire to be able to use his gym, where his friends were members, and asked that any restraining order entered establish a schedule for the parties' separate use of the facility rather than prohibiting respondent from all such use.

The parties stipulated that Commissioner Susan B. King could act as temporary judge in this case and a hearing was held on September 2, 1998. At the hearing, the judge stated that she thought appellant had a "great case for a harassment order," but it was a civil harassment case rather than a domestic violence one. The judge noted that the other relationships enumerated in the DVPA were "spouses, people with whom you've had a child, people that you've lived with, cohabitants," and stated that "four outings in groups in 1996 is not a dating relationship." The judge suggested treating the case as one for a civil harassment order, but appellant apparently did not wish to pursue that course. After a brief discussion of the parties' wishes regarding use of the gym, the court concluded it was going to be "impossible" to work out an order and dismissed the case for lack of jurisdiction, without prejudice to appellant filing a civil harassment case.

On September 4, 1998, appellant filed a petition for an injunction under Code of Civil Procedure section 527.6.[3] An order to show cause and temporary restraining order issued on September 4 and was filed on September 8, with a hearing date set for September 18. The order to show cause was served on respondent on September 15. Respondent stipulated to entry of restraining orders which prohibited contacting appellant and required respondent to stay away from the gym during specified hours; appellant agreed to forgo attorney fees and costs regarding this matter. The resulting injunction was filed on September 18.

---

[3]Pursuant to respondent's request, we take judicial notice of the petition and other court documents and transcript related to the Code of Civil Procedure section 527.6 proceeding, including the injunction itself, of which appellant also requested we take judicial notice. (Evid. Code, § 452.)

The order dismissing the DVPA case was filed on October 13, 1998, and notice of entry of the order was served on October 15 and filed on October 21. Appellant's notice of appeal was timely filed on December 11, 1998.

## DISCUSSION

### I.

The DVPA provides for issuance of orders "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved, if an affidavit shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (Fam. Code, § 6300.) "Domestic violence" is defined in section 6211 of the DVPA as "abuse perpetrated against any of the following persons:

"(a) A spouse or former spouse.

"(b) A cohabitant or former cohabitant, as defined in Section 6209.

"(c) A person with whom the respondent is having or has had *a dating or engagement relationship*.

"(d) A person with whom the respondent has had a child, where the presumption applies that the male parent is the father of the child of the female parent under the Uniform Parentage Act . . . .

"(e) A child of a party or a child who is the subject of an action under the Uniform Parentage Act, where the presumption applies that the male parent is the father of the child to be protected.

"(f) Any other person related by consanguinity or affinity within the second degree." (Italics added.)

Appellant sought the protection of the DVPA under subdivision (c) of Family Code section 6211. She contends the trial court erred in failing to apply the "everyday literal meaning of the word 'date or dating' " to find that the parties had a "dating relationship" within the meaning of the statute. She additionally urges the trial court erred in finding that " 'only four dates' " was insufficient to meet the definition of the DVPA.

"The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*T. M. Cobb Co.* v. *Superior Court* (1984) 36 Cal.3d 273, 277 [204 Cal.Rptr. 143, 682 P.2d 338].) An equally basic rule of statutory construction is that courts are bound to give effect to statutes according to the usual

and ordinary meaning of the language employed in framing them. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222 [110 Cal.Rptr. 144, 514 P.2d 1224].) Although a court may properly rely upon extrinsic aids, it should first look to the words of the statute to determine the Legislature's intent. Where the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)" (*O'Kane* v. *Irvine* (1996) 47 Cal.App.4th 207, 211 [54 Cal.Rptr.2d 549].)

The DVPA was originally enacted in 1979. (Stats. 1979, ch. 795 § 10, pp. 2710-2711.) At that time, the Legislature had been advised that legal remedies then available to battered persons—specifically the injunctive relief available under Code of Civil Procedure section 527, subdivision (a), and protective orders then available under the Family Law Act—were ineffective in dealing with domestic violence. A lengthy 1978 Report of the Advisory Commission on Family Law to a subcommittee of the Senate Judiciary Committee observed, for example, that the laws then providing for protective orders only addressed the need for immediate protection and included no "specific authority enabling the courts to grant orders pertaining to other issues which may need to be decided or to other individuals in need of the court's protection in order to provide comprehensive relief. [¶] Most victims of domestic violence seem to have little, if any, knowledge of the availability of protective orders or the various legal methods of enforcing their rights. [¶] Enforcement of protective orders has been generally non-existent. This non-enforcement policy is the failure of existing statutes to provide the necessary mandate for law enforcement officers to insure compliance with valid court orders or quick protective action when violations occur. [¶] Given the many problems that interfere with the execution and enforcement of protective orders, it is not surprising that a widely held attitude among attorneys, law enforcement officers and batterers is protective orders are not worth the paper they are printed on." (Advisory Com. on Family Law, First Report to Sen. Subcom. on Admin. of J. (Oct. 23, 1978) p. 10; *Caldwell* v. *Coppola* (1990) 219 Cal.App.3d 859 [268 Cal.Rptr. 453].)

As a result of this and similar advice from other sources, the Legislature inserted in the pertinent law, which now appears in the Family Code, elaborate provisions relating to the issuance and effect of emergency protective orders (Fam. Code, §§ 6250-6257), the duties of law enforcement officers (Fam. Code, §§ 6270-6273), various services for victims of domestic violence, such as the appointment of a "support person" who can "provide moral and emotional support for a person who alleges he or she is a

victim of domestic violence" and accompany that person at legal proceedings and mediation sessions (Fam. Code, § 6303), and the various forms of injunctive and other relief that can be made available (Fam. Code, §§ 6320-6345), including the payment of child support by a presumed father (Fam. Code, § 6341), restitution for loss of earnings and out-of-pocket expenses (Fam. Code, § 6342), and attorney fees and costs (Fam. Code, § 6344). The stated purposes of the foregoing provisions "are to prevent the recurrence of acts of violence and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (Fam. Code, § 6220.)

Originally, the DVPA did not protect persons in a "dating relationship." As first enacted, the DVPA applied only to family members and persons who regularly resided in the household and had sexual relations with another family or household member, or had so resided within the last six months. (Former Code Civ. Proc., § 542, subds. (b), (c); Stats. 1979, ch. 795, § 10, p. 2711.) The DVPA was soon amended to delete the requirement of a sexual relationship for persons regularly residing in the household (former Code Civ. Proc., § 542, subd. (c); Stats. 1980, ch. 1158, § 6, p. 3880), and subsequently amended to extend to abuse between parents of a minor child. (Former Code Civ. Proc., § 542, subd. (c); Stats. 1984, ch. 1163, § 3, pp. 3995-3996.) Finally, as previously noted, the statute was amended to include the present "dating or engagement relationship" language. (Former Code Civ. Proc., § 542, subd. (b)(1); Stats. 1990, ch. 752, § 2, p. 3409.)

This last language was added in 1990, in a measure (Assem. Bill No. 4000 (1989-1990 Reg. Sess.)) sponsored by the Los Angeles City Attorney's Office. A report on the bill states that "[t]he laws governing eligibility for a restraining order need to be expanded to include the many victims who do not qualify currently as they are not a blood relative, former or current spouse, co-parent, or live-in partner with their abuser. Many cases of domestic violence in a dating relationship must [therefore] be handled through the harassment order [i.e., that available under Code Civ. Proc., § 527.6], which offers less protection and can be a financial burden for petitioners." (Legis. Analyst, analysis of Assem. Bill No. 4000 (1989-1990 Reg. Sess.) as amended May 16, 1990, p. 4.) A Senate committee report on the measure states that expanding coverage of the DVPA to include "a person with whom the respondent has had a child or has had a dating relationship . . . is intended to encompass a broad range of modern relationships that may be affected by acts of violence and sexual abuse." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 4000 (1989-1990 Reg. Sess.) p. 2.) So far as we can tell, the foregoing statements are the only portions of the legislative

history shedding any light on the reason the protections of the DVPA were extended to persons in a "dating relationship."

The DVPA does not define the phrase "dating or engagement relationship,"[4] and the meaning of a "dating relationship"[5] is not clear enough to delineate the particular meaning the Legislature had in mind when it used these words.[6]

The practice of "dating" evolved in this nation during the 1920's. (Modell, *Dating Becomes the Way of American Youth* in Essays on the Family and Historical Change (Moch & Stark edits., 1983) p. 91.) "The defining characteristic of the new dating system and, what is more critical, of the graduated series of dates that might lead to a closer relationship between young men and women was that a date was away from home, unchaperoned, and not subject to parental veto; it depended upon the free election of the participants. Certainly, *some* American boys and girls of the middle classes had coupled in every imaginable way without parental awareness before the turn of the century, but 'dates' of this sort lacked the continuity and regularity that the full evolution of the dating system would permit after World War I." (*Id.*, pp. 92-93, italics in original.) "Dating," it has been said, is "a twentieth-century term for a primarily recreational aspect of courting." (1 Encyclopedia of Soc'y (1991) p. 333.) "In twentieth-century America, the new system of dating added new stages to courtship and multiplied the number of partners (from serious to casual) an individual was likely to have before marriage. All this premarital experience necessarily had an impact on the final stages of mate selection. Thus, . . . the unattached flirt, the engaged college seniors, the eighth-grade 'steadies,' and the mismatched couple on a blind date are all engaged in courtship." (Bailey, From Front Porch to Back Seat: Courtship in Twentieth-Century America (1988) p. 6.) It is important to note, finally, that customs of courtship, and in particular those that relate to "dating," are not fixed and are constantly changing. (See, e.g., Newcomb, *Recent Changes in Attitude Toward Sex and Marriage* (1937) 2 Am. Soc. Rev. 659 and Waller, *The Rating and Dating Complex* (1937) 2 Am. Soc. Rev. 727; cf. Gordon, *Was Waller Ever Right? The Rating and*

---

[4]Nor does Penal Code section 13700, from which this phrase in the definition of "domestic violence" was drawn. (Cal. Law Revision Com. com., 29E West's Ann. Fam. Code (1994 ed.) foll. § 6211, pp. 5-6.)

[5]We confine our analysis to the concept of a "dating relationship" rather than an "engagement relationship," as the parties are not and never were engaged.

[6]Standard dictionaries do not define a "dating relationship," and the pertinent definition of a "date"—"[a]n appointment or engagement at a particular time, freq. with a person of the opposite sex, a social activity engaged in by two persons of opposite sex" (Oxford English Dict. (2d ed. CD-ROM 1994))—is not particularly useful. Moreover, contrary to this definition, we perceive no basis for limiting the reach of the DVPA to relationships between persons of opposite sex.

*Dating Complex Reconsidered* (1981) 43 J. of Marriage and the Fam. 67, 75 ["Now, even non-competitive, pluralistic dating is giving way to more group-based activity. Young men and women are socializing together in groups as the path that ultimately leads to exclusive, though not necessarily mate choice-oriented, relationships."]; Miller & Gordon, *The Decline in Formal Dating: A Study in Six Connecticut High Schools* (1986) 10 Marriage and Fam. Rev. 139 [the "mixed-sex group socializing" that is "seemingly replacing one-on-one couple dating . . . . gives young people much more room, so to speak, to reject and experiment with various modes of heterosexual interaction . . . . [and] does not involve the traditional quid pro quo bargain that characterized formal dating."].)

While the DVPA "clearly has a broad protective purpose, both in its stated intent and the breadth of the persons protected (see *Caldwell v. Coppola, supra*, 219 Cal.App.3d 859, 863.)" (*O'Kane v. Irvine, supra*, 47 Cal.App.4th at p. 212), it reflects no legislative intent to extend its protection to *all* categories of people who have social relationships with one another (see *ibid.* [DVPA inapplicable where victim and perpetrator of abuse separately rented rooms in same house, sharing common areas]) or even all the informal socializing relationships that could conceivably be described as "dating." As reflected in the other categories of relationships enumerated in Family Code section 6211, the DVPA aims to protect individuals from harassment and abuse by people in relationships that involve some measure of exclusivity or at least continuity—spouses, cohabitants, parents and family members. To state the obvious, the problem addressed by the DVPA is *domestic* violence. "Domestic," according to the Oxford English Dictionary, *supra*, means "[o]f or belonging to the home, house, or household; pertaining to one's place of residence or family affairs; household, home, 'family.' " The "dating relationship" specified in Family Code section 6211, subdivision (c), which appears to be less formal than the "engagement relationship" with which it is associated in that subdivision, is at the outer edge of the relationships covered by the DVPA in terms of intimacy or connection between the individuals involved; whereas the other relationships covered by the DVPA are patently "domestic," a "dating" relationship might be viewed as a step toward a potentially domestic relationship. Moreover, the other relationships covered by the DVPA—those between current or former spouses, cohabitants, co-parents, or blood relatives—are more objectively discernible than a "dating relationship."

The parties assume, without discussion, that for purposes of the DVPA a "dating relationship" is simply one in which the parties have a "romantic" interest in one another, and that this excludes relationships in which the mutual interest, or perhaps even the interest of just one party, is "platonic."

The parties disagree only as to whether their past relationship was, in fact, "romantic" or "platonic."

We have no quarrel with the proposition that a "dating relationship" ordinarily refers to a "romantic," as opposed to a "platonic" relationship between two people, as those words are today commonly understood.[7] However, while contemporary or classical concepts of romantic and platonic love can sometimes be judicially relevant (see, e.g., Nussbaum, *Platonic Love and Colorado Law: The Relevance of Ancient Greek Norms to Modern Sexual Controversies* (1994) 80 Va. L.Rev. 1515; Posner, Sex and Reason (1992) p. 1), the concepts are too abstract to provide useful guidance in judicial fact finding. More importantly, an unlimited inquiry into the "romantic" or "platonic" nature of a relationship could frustrate the remedial purposes of the DVPA. One of the circumstances a court might seize upon to determine whether a particular relationship was "romantic" or "platonic," because it may be thought to mark the difference, is the sexual intimacy of the parties, if any, or the degree of any such intimacy. Such an inquiry would be of questionable validity, however, as human experience teaches that sexual intimacy does not necessarily reflect a romantic interest (see, e.g., Huxley, Point Counter Point (1928) ["He had such a pure, childlike and platonic way of going to bed with women, that neither they nor he ever considered that the process really counted as going to bed."]) and a romantic relationship need not involve sexual intimacy. (As, e.g., the relationship between Jake Barnes and Brett Ashley in Ernest Hemingway's 1926 novel, The Sun Also Rises; see also Austen, Sense and Sensibility (1811).) Though the two are certainly not incompatible, neither is the one necessary to the other. Moreover, if sexual intimacy were deemed a relevant indicator of romantic interest, what level of intimacy would have to be shown? Would a kiss be enough or would something more be required and, if so, what?

The graver danger presented by the simplistic proposition that a "dating relationship" is one involving a certain level of physical intimacy is that the

---

[7] The Oxford English Dictionary, *supra*, provides five primary definitions of "romantic" when the word is used as an adjective. The most relevant states that "collocation of the adjective with *love, lover, friendship*, and the like, provide evidence of the emergence of its common present-day use to convey the idealistic character or quality of a love affair." (Italics in original; for an interesting disquisition on the use of the word "romantic" in the English language, which goes back to the 17th century, see Barzun, From Dawn to Decadence: 500 Years of Western Cultural Life, 1500 to the Present (2000) pp. 467-469.)

The most pertinent definition of "platonic" provided by the Oxford English Dictionary, *supra*, states that the word is "[a]pplied to love or affection for one of the opposite sex, of a purely spiritual character, and free from sensual desire." It also notes that "platonic" was earlier used "to denote the kind of interest in young men with which Socrates was credited: cf. the last few pages of Plato's Symposium. As thus originally used, it had no reference to women."

need to establish such past intimacy in a public forum in order to obtain relief under the DVPA would almost certainly discourage many from seeking the relief that Act affords, though they be desperately in need of it. The amorous intentions or sexual expectations of the parties are undoubtedly important characteristics of a "dating relationship," but the definition of such a relationship cannot be made to depend on the past sexual intimacies of the parties or the nature of such intimacies.

The failure of the Legislature to define the nature of the "dating relationship" it had in mind creates a daunting judicial problem. "Dating" can signify so many different types of relationships—some clearly within the ambit of the DVPA, some clearly not (see, e.g., *People v. Elliott* (1966) 241 Cal.App.2d 659 [50 Cal.Rptr. 757])—that we must find some place to draw the line. Whatever the "dating relationship" contemplated by the Legislature may be, however, it relates to a state of mind; a sentiment different people experience in different ways and in different degrees, and for which, in truth, there are no reliable objective measurements to help identify the place at which to draw the necessary line. Therefore, as no judicial attempt to compass the human mind can fully succeed, we can devise no completely satisfactory definition of the "dating relationship" the Legislature contemplated. Our hope is only to provide a more useful touchstone than that provided by the language of the Act. In the event the Legislature disagrees with the meaning we impute to its words, we hope and expect it will correct us.

We commence our exegetical enterprise by looking to the law of other jurisdictions that have addressed the problem. Domestic violence prevention statutes in many other states employ language similar to that found in Family Code section 6211, subdivision (c). (E.g., Ala. Code § 15-10-3(b)(3) ["dating or engagement relationship"] [Alabama]; Alaska Stat. § 18.66.990(5)(C) ["are dating or have dated"] [Alaska]; 725 Ill. Comp. Stat. § 5/112A-3(3) ["dating or engagement relationship"] [Illinois]; Mass. Gen. Laws Ann. ch. 209A, § 1(e) ["substantive dating relationship"] [Massachusetts]; Mich. Comp. Laws Ann. § 600.2950 (1) [Michigan]; Mont. Code Ann. § 45-5-206(2)(b) ["dating or ongoing intimate relationship with a person of the opposite sex"] [Montana]; Nev. Rev. Stat. § 33.018(2) ["dating relationship"] [Nevada]; N.J. Rev. Stat. § 2C:25-19(d) ["dating relationship"] [New Jersey]; N.D. Cent. Code § 14-07.1-01(4) ["dating relationship"] [North Dakota]; R.I. Gen. Laws 1956, § 8-8.1-1(3) ["substantive dating or engagement relationship within the past six (6) months"] [Rhode Island]; Tenn. Code Ann. § 36-3-601(9)(C) ["who are dating or who have dated"] [Tennessee]; Wash. Rev. Code § 10.99.020(1) ["dating relationship"] [Washington]; W.Va. Code § 48-2A-2(b) ["persons who . . . are or were dating"] dated"]

[West Virginia].) A few of these statutes, unlike the DVPA, contain express definitions of the term "dating relationship." Thus, the Illinois statute provides that "neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship." (725 Ill. Comp. Stat. § 5/112A-3(3).) In Michigan, " 'Dating relationship' means frequent, intimate associations primarily characterized by the expectation of affectional involvement. This term does not include a casual relationship or an ordinary fraternization between 2 individuals in a business or social context." (Mich. Comp. Laws Ann. § 600.2950(30)(a).) In Nevada, " 'dating relationship' means frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement. The term does not include a casual relationship or an ordinary association between persons in a business or social context." (Nev. Rev. Stat. § 33.018.) The Tennessee definitions of "dating" and "dated" similarly "do not include fraternization between two (2) individuals in a business or social context." (Tenn. Code Ann. § 36-3-601(9)(C).) Under the Washington statute, " '[d]ating relationship' means a social relationship of a romantic nature. Factors that the court may consider in making this determination include: (a) The length of time the relationship has existed; (b) the nature of the relationship; and (c) the frequency of interaction between the parties." (Wash. Rev. Code § 26.50.010(3).)

The above statutory definitions limit the term "dating relationship" not just by requiring some showing of "affectional involvement" but by excluding casual social relationships. Massachusetts case law similarly limits the reach of that state's "substantive dating relationship" language. In one case, considering the scope of the "dating" relationship as relevant to a determination of probable cause in a criminal case, the court explained, "Mass.Gen.L.Ch. 209A exists to enable victims of domestic violence to distance themselves from their batterers. . . . [¶] The 'substantive dating relationship' language of the statute is clearly a proxy for a close domestic relationship between an individual living with, or near, another." (*White v. Town of Marblehead* (D.Mass. 1997) 989 F.Supp. 345, 351-352, fn. 8.) In another case, the court rejected the contention that the victim could not be in a "substantive dating relationship" with the perpetrator because she was living with a different man at the time, noting that the perpetrator referred to the victim as a former girlfriend, saw her several times a week, had been sexually active with her, and revealed in his personal correspondence "an emotional relationship which entailed substantially more than a few casual dates." (*Brossard v. West Roxbury Dist. Court* (1994) 417 Mass. 183 [629 N.E.2d 295, 296].)

Because they all relate to statutes similar to the DVPA, the foregoing legislative and judicial definitions of "dating relationship" are instructive as

to what the California Legislature most likely had in mind by its use of that phrase. Adopting the sense of those legislative and judicial prescriptions, and in light of the other classes of persons protected by our Legislature under the DVPA, we conclude that, for purposes of the Act, a "dating relationship" refers to serious courtship. It is a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual.

We do not think there ever was such a continuing and mutually committed emotional relationship between the parties before us. Appellant and respondent went on four social outings (on only one of which they were alone) and had telephone conversations, e-mail correspondence and contacts at the gym for a period of several months. Immediately after their first date, however, appellant told respondent she was not interested in a romantic relationship with him; their relationship was relatively brief and never exclusive, at least insofar as appellant was concerned, and respondent was immediately disabused of any expectation that an exclusive romantic relationship might be established. The police report resulting from appellant's complaint about respondent's harassment stated that appellant described her relationship with respondent as "platonic" and indicated she had conveyed this sentiment to respondent. Appellant specifically corrected the police report's listing of her as appellant's "girlfriend," stating she should be referred to as an "acquaintance." Respondent's declaration confirms that the parties expressly agreed to be no more than "friends" and relates appellant's having reiterated this point by telling her family at the Christmas dinner that she and respondent were "just friends." The prospect of a "dating relationship" was, in short, quashed almost at the outset.

This finding does not leave appellant without any relief. It must be remembered that finding the DVPA inapplicable to a given instance of harassment or abuse does not leave the victim without remedy, as he or she can seek a temporary restraining order and injunction under Code of Civil Procedure section 527.6. This is precisely what the trial court suggested in the present case, and what appellant did after dismissal of the application under the DVPA.

One of the chief differences between the relief available to appellant under Code of Civil Procedure section 527.6 and that potentially available under the DVPA is that the DVPA authorizes the court to order restitution "for loss

of earnings and out-of-pocket expenses, including, but not limited to, expenses for medical care and temporary housing, incurred as a direct result of the abuse inflicted by the respondent or any actual physical injuries sustained from the abuse." (Fam. Code, § 6342.) The potential for such restitution is presumably the reason appellant chose to proceed under the DVPA even after obtaining the injunctive relief she sought under a different statute. It is also the only reason this entire appeal is not moot, injunctive relief having been obtained despite the adverse ruling of the trial court. Having concluded the trial court correctly dismissed the application under the DVPA for lack of jurisdiction, we need not determine whether appellant would in fact have been entitled to any or all of the restitution she sought.

## II.

Respondent seeks sanctions against appellant and her attorney, claiming the appeal is frivolous and arguing that appellant and her attorney improperly used legal procedures to harass and impose undue expense upon respondent, twice serving him in an unduly humiliating manner and taking advantage of respondent's attorney's vacation to schedule the hearing on the Code of Civil Procedure section 527.6 restraining order while he was unavailable.[8]

---

[8]Respondent's declaration in the trial court described the service of the DVPA papers as follows: Minutes before a public meeting he was supposed to attend as staff liaison, the receptionist informed him there was someone to see him. In the reception area, in front of respondent's coworkers, the visitor began to explain each of several court papers in a loud voice, asking "[w]ere you living with her?" and stating "[a]nd you have to appear in court on this date!" Respondent was distraught and began to cry in front of his coworkers; his branch chief took him and his supervisor into a private office, allowed him to take off the remainder of the day and had his supervisor attend the public meeting in his place.

With respect to the Code of Civil Procedure section 527.6 papers, according to respondent's declaration on this appeal, although appellant's attorney knew respondent's attorney would accept service on his behalf, respondent was again served at work in a "stressful and humiliating manner." The server, who appeared to be the same one who had served the DVPA application, gave a different name and, when asked to leave by the receptionist, loudly announced, " 'this is personal' and 'he's been harassing someone.' " She then walked past the receptionist and left the papers open on respondent's chair, respondent having left his desk to call his attorney. As respondent's attorney was on vacation at the time of service and the hearing, his partner was required to assist respondent on this matter.

According to the declaration of respondent's attorney, just before the hearing on the DVPA application, he asked appellant's attorney to discuss entering a stipulated restraining order, with a compromise on the attorney fees and restitution appellant was seeking, and was told appellant would not compromise on the financial issues. According to respondent's attorney's declaration submitted on this appeal, after the September 2 hearing he left a telephone message and wrote to appellant's attorney, asking her to discuss working out the civil

Respondent argues the appeal is frivolous by characterizing it as raising solely an impossible-to-win substantial evidence issue. According to respondent, the only question for us to decide on the appeal is whether substantial evidence supports the trial court's conclusion that the parties did not have a "dating relationship." We disagree. No California case has previously construed the provision of the DVPA here at issue. This appeal required us to resolve a legal question—definition of a "dating relationship"—and not merely to evaluate the sufficiency of the evidence to support the trial court's conclusion.

■ "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179] (*Flaherty*); see *Estate of Walters* (1950) 99 Cal.App.2d 552, 558-559 [222 P.2d 100].) Litigants and attorneys, however, have a right to present issues that are "arguably correct" even if they do not ultimately prevail. (*Flaherty, supra,* 31 Cal.3d at p. 650.) "[A]n appeal that is simply without merit is not by definition frivolous and should not incur sanctions." (*Ibid.*, italics omitted.) As *Flaherty* explained, because " 'the borderline between a frivolous appeal and one which simply has no merit is vague indeed,' " the power to dismiss frivolous appeals should be exercised in only the "clearest cases" and the power to punish attorneys for prosecuting frivolous appeals "should be used most sparingly to deter only the most egregious conduct." (*Id.* at p. 651.)

■ While we have rejected appellant's position on this appeal, we cannot say the appeal was frivolous. Respondent attempts to portray appellant as having acted in bad faith, stressing her reluctance to informally resolve the restraining order issue as well as the timing of her application for the civil restraining order and service of the order to show cause and the manner in which respondent was served with process in both the DVPA and civil harassment cases. This appeal, however, did raise a legitimate issue; indeed, definition of the scope of the DVPA by clarifying the meaning of the phrase "dating relationship" will affect cases other than this one. Additionally, while the fact that appellant is presently protected by the Code of Civil Procedure section 527.6 restraining order renders the appeal irrelevant on the issue of injunctive relief, appellant believed she stood to gain financially from the appeal through her claim for restitution under the DVPA. Accordingly, we cannot conclude that this appeal was pursued solely to harass respondent.

restraining order informally. In this letter, he informed appellant's attorney that he would be on vacation from September 5 through 21.

## Disposition

The trial court's order dismissing the application for injunctive and other relief under the DVPA is affirmed. Respondent's request for sanctions is denied. Costs to respondent.

Haerle, J., and Lambden, J., concurred.