2020 IL App (2d) 180473
No. 2-18-0473
Opinion filed November 10, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CM-626 |
| CHRISTOPHER D. ALLEN, | ) ) | Honorable James M. Hauser, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Christopher D. Allen, appeals his conviction of domestic battery (insulting or provoking contact) (720 ILCS 5/12-3.2(a)(2) (West 2018)). He contends that the State failed to prove that A.R., the victim, was a " 'Family or household member[ ]' " of his, as required under section 12-0.1 of the Criminal Code of 2012 (Code) (720 ILCS 5/12-0.1 (West 2018)) for a conviction of *domestic* battery. Specifically, he contends that, because his relationship with A.R. was primarily sexual, and not "romantic," they were not in "a dating or engagement relationship" under section 12-0.1, which defines " 'Family or household members' " to include "persons who have or have had a dating or engagement relationship" (720 ILCS 5/12-0.1 (West 2018)). We disagree. We here clarify that, when we held in *People v. Young*, 362 Ill. App. 3d 843, 851 (2005),

that a "dating relationship" is, "at a minimum, an established relationship with a significant romantic focus," we meant the word "romantic" in a broad sense that encompasses both relationships that are "romantic" in a conventional sense *and* those that are mainly sexual. We hold that defendant's relationship with A.R. met *Young*'s definition of a dating relationship. We thus affirm his conviction.

¶ 2                                             I. BACKGROUND

¶ 3      Defendant was charged by complaint with one count of domestic battery (bodily harm) (720 ILCS 5/12-3.2(a)(1) (West 2018)) and one count of domestic battery (insulting or provoking contact) (720 ILCS 5/12-3.2(a)(2) (West 2018)). Both counts charged that, on August 20, 2018, defendant choked A.R., his "girlfriend."

¶ 4      The only matter at issue in this appeal is whether the State adequately proved that defendant and A.R. were in a "dating relationship" under section 12.01 of the Code, and thus that A.R. was a "family or household member" of defendant's, as required for a domestic battery conviction. (720 ILCS 5/12-0.1 (West 2018)).

¶ 5      At defendant's jury trial, A.R. testified that she and defendant had been dating for about eight months as of August 20, 2018. However, their relationship was "on and off," and he would sometimes ignore her for two weeks at a time. She viewed herself as "romantically involved" with defendant. She and defendant had been seeing each other roughly every other day just before the incident. They had been out on "actual date[s]" a "couple [of] times," to Olive Garden and Union Dairy, but they "mostly just s[a]t at [defendant's] house and order[ed] in, [and] watch[ed] movies." The two had a sexual relationship, and A.R. loved defendant.

¶ 6      Defendant also testified about their relationship. He agreed that they had gone out to Olive Garden. However, the entirety of their relationship was having sex. "We didn't get along. Like,

she literally would come down, we would have sex, and she would go home." He did not consider them to be dating. In his view, to be dating meant being boyfriend and girlfriend. He was not A.R.'s boyfriend; someone else was her boyfriend, and defendant was seeing "multiple" other women. A.R. "wanted a deeper relationship," but he "didn't want one because *** [he] didn't feel like [he] was in a place to be in a relationship at the time." He "wasn't looking for a girlfriend"; A.R. "understood that and acted as if she respected it, but [the court case] is the outcome of it." She contacted him multiple times after the incident.

¶ 7    The jury found defendant guilty of domestic battery (insulting or provoking contact) but not guilty of domestic battery (bodily harm). The court sentenced defendant to 2 years' probation, including 10 days in jail. Defendant timely appealed.

¶ 8                                    II. ANALYSIS

¶ 9    On appeal, defendant argues that the State failed to establish that he and A.R. were in a "dating relationship" under the meaning of that term in section 12-0.1 of the Code. He contends that Illinois courts have concluded that a "dating relationship" must be a "serious courtship," which is a relationship with a "significant romantic focus" and a shared expectation of growth. He contends that the State failed to adequately show that his relationship with A.R. had any of those characteristics and that we should thus reduce his conviction to one for simple battery.

¶ 10    We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237 (1985): when a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "[W]here the finding of

guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). However, "[i]n conducting this inquiry, the reviewing court must not retry the defendant." *Cunningham*, 212 Ill. 2d at 279-80. "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. Although we must accord great deference to the fact finder's decision to accept testimony and must view the evidence in the light most favorable to the prosecution, the fact finder's decision is not conclusive. *Cunningham*, 212 Ill. 2d at 280. Nevertheless, the properly admitted statements of a single witness, if positive and credible, are sufficient to support a conviction, even though the defendant contradicts those statements. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 11    Taking the evidence here in the light most favorable to the prosecution, we may assume that A.R.'s testimony was convincing and that defendant's testimony was not, at least to the extent that it was unfavorable to the State. Thus, the question on appeal is whether A.R.'s testimony— that she loved defendant and believed that they were romantically involved, that she and defendant had been dating off and on for eight months and had a sexual relationship, and that they got together regularly to watch movies at his house—was sufficient to establish that she and defendant had a dating relationship. We conclude that it was.

¶ 12    A person commits the offense of domestic battery if he or she knowingly and without legal justification causes bodily harm to any family or household member or makes physical contact of an insulting or provoking nature with any family or household member. 720 ILCS 5/12-3.2(a) (West 2018). As we noted, section 12-0.1 of the Code defines " 'Family or household members' "

as including "persons who have or have had a dating or engagement relationship." 720 ILCS 5/12-0.1 (West 2018). That section adds that "neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship." 720 ILCS 5/12-0.1 (West 2018).

¶ 13    Defendant asks us to follow *People v. Howard*, 2012 IL App (3d) 100925, to conclude that, because his relationship with A.R. was primarily physical, and not romantic, they were not in a dating relationship and that he thus could not be guilty of domestic battery. We disagree. As we explain below (*infra* ¶¶ 20-23), *Howard* is distinguishable and, more critically, when the *Howard* court contrasted "physical" and "romantic" relationships, it misread the relevant precedent—our own opinion in *Young*, 362 Ill. App. 3d 843. We agree with the dissent in *Howard*, which concluded that the majority's analysis of what constitutes a "dating relationship" excludes far too many relationships. *Howard*, 2012 IL App (3d) 100925, ¶ 18 (Schmidt, P.J., dissenting).

¶ 14    We also reject defendant's urging to adopt the definition of a dating relationship applied in the California case of *Oriola v. Thaler*, 100 Cal. Rptr. 2d 822, 832-33 (Ct. App. 2000):

> "a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual."

In *Young*, we relied heavily on our analysis in *Alison C. v. Westcott*, 343 Ill. App. 3d 648 (2003), a case under the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2002)). In *Alison C.*, we in turn drew on *Oriola* and quoted *Oriola*'s definition with approval. *Alison C.*, 343 Ill. App. 3d at 652-53. However, we did not *adopt Oriola*'s definition in *Alison C.*, and we decline to do so here. The *Oriola* definition is both cumbersome and entirely impractical.

Furthermore, the language that entered our case law from *Oriola* by way of *Alison C.* has proven to be misleading—as exemplified in *Howard*—and we think that it is useful to clarify our meaning.

¶ 15    In *Alison C.*, we addressed the meaning of "dating relationship" in deciding whether the plaintiff was a family or household member of the defendant's and so entitled to an order of protection under the Act. Section 103(6) of the Act (750 ILCS 60/103(6) (West 2002)) defines " 'Family or household members' " in the same terms as does section 12-0.1 of the Code. The defendant asserted that the plaintiff's petition for an order of protection should be dismissed on the basis that "the parties had gone on only one lunch date" and were therefore "not engaged in a 'dating relationship.' " *Alison C.*, 343 Ill. App. 3d at 650.

¶ 16    Initially, we concluded that the term "dating relationship" was ambiguous. *Alison C.*, 343 Ill. App. 3d at 651. Therefore, we looked beyond the Act's language as written to discern the legislative intent behind the ambiguous phrasing. *Alison C.*, 343 Ill. App. 3d at 651-52. We took guidance from *Oriola*, which "extensively examined what types of dating relationships are encompassed by other states' domestic violence protection statutes." *Alison C.*, 343 Ill. App. 3d at 652. We adopted the *Oriola* court's view that a " 'dating relationship' " refers to a " 'serious courtship.' " *Alison C.*, 343 Ill. App. 3d at 652 (quoting *Oriola*, 100 Cal. Rptr. 2d at 832). We also quoted the full 59-word definition of a "dating relationship" that defendant asks us to adopt here. See *Alison C.*, 343 Ill. App. 3d at 653. We held that "the Illinois legislature intended for a 'dating relationship' under section 103(6) of the Act to refer to a serious courtship, like that discussed in *Oriola*." *Alison C.*, 343 Ill. App. 3d at 653. Thus, we concluded that a single date did not create a "dating relationship" under the Act. *Alison C.*, 343 Ill. App. 3d at 653. However, we did not need to rely on *Oriola*'s full definition of "dating relationship" to decide the appeal. The lack of

evidence of any enduring courtship-like relationship was sufficient to require dismissal of the petition.

¶ 17 In *Young*, which we decided two years after we decided *Alison C.*, we addressed the interpretation of a "dating relationship" as section 12-0.1 of the Code uses that term. In *Young*, the alleged victim in a domestic violence prosecution testified that she and the defendant had a social relationship but had been on only one date. The two, who were homeless, spent days in one another's company and sometimes slept in the same shelter. However, the victim denied that they were in a dating relationship, and the State presented no evidence that the relationship was characteristically sexual or romantic. We concluded that the two did not have a dating relationship. We recognized that we had addressed a similar issue in *Alison C.* and approved its use of *Oriola* as a source of guidance:

"This court *** held [in *Alison C.*] that a ' "dating relationship" is a serious courtship,' 'a relationship that [is] more serious and intimate than casual.' [Citation.] *** [W]here, as here, the evidence suggests that the relationship was serious and intimate but its focus—friendly or romantic—is unclear, we need to consider what constitutes a 'serious courtship.' *** [I]n *Alison C.*, we adopted the reasoning of *** [*Oriola*], which looked to sociological studies to outline the practices of dating. *Oriola* used the term 'courtship' in a broad sense: ' "the unattached flirt, the engaged college seniors, the eighth-grade 'steadies,' and the mismatched couple on a blind date are all engaged in courtship." ' [Citation.] The word 'courtship,' in this sense, encompasses most romantically oriented behavior outside marriage, whether or not the relationship is consummated. In this context[,] a '*serious courtship*' is not limited to a relationship likely to lead to marriage. However, we think that

it is clear that a 'serious courtship' must be, at a minimum, an established relationship with a significant romantic focus." (Emphasis in original.) *Young*, 362 Ill. App. 3d at 851. We thus held that the evidence did not establish that the defendant and the victim were in a dating relationship. *Young*, 362 Ill. App. 3d at 852.

¶ 18     Our discussion in *Young* made clear that we were using the term "courtship" broadly and not, for instance, to describe solely relationships in which marriage is the object. (More obviously, we were not using "courtship," as it is sometimes used, to specify what is intended to be a less sexualized alternative to "dating.") What we were not as clear about was the similarly broad sense in which we were using the word "romantic," which derived from our consideration of *Oriola*. In *Oriola*, both parties took the position that the distinction between an ordinary social relationship and a dating relationship is that one is "platonic" whereas the other is "romantic." *Oriola*, 100 Cal. Rptr. 2d at 830. The *Oriola* court, while recognizing that "romantic" relationships need not involve sexual intimacy, nevertheless rejected "romantic" as a descriptor of a necessary characteristic of dating relationships. Its concern was that that trial courts might construe the word too narrowly and thus deny the protections of domestic violence laws to individuals in dating relationships lacking a sexual component: "The amorous intentions or sexual expectations of the parties are undoubtedly important characteristics of a 'dating relationship,' but the definition of such a relationship cannot be made to depend on the past sexual intimacies of the parties or the nature of such intimacies." *Oriola*, 100 Cal. Rptr. 2d at 831. When the *Oriola* court picked its descriptor of "dating relationship[s]," it instead used the term "amorous." See *Oriola*, 100 Cal. Rptr. 2d at 832-33. In *Young*, we did not adopt that term, which strikes us as even more likely than "romantic" to be taken to *necessarily* imply a sexual relationship. Thus, we selected the term "romantic" to distinguish dating relationships from platonic or purely social relationships, and not to distinguish

them from purely sexual relationships. Therefore, under the rule in *Young*, to make a dating relationship hinge on the presence of conventional markers of "romance," such as gifts of flowers or candlelight dinners, is as much a mistake as making it hinge on a showing of sexual intimacies.

¶ 19     In *People v. Irvine*, 379 Ill. App. 3d 116 (2008), a First District panel made what we deem to be an appropriate use of the rule in *Young* and *Alison C.* In *Irvine*, the defendant and the victim had dated for about six weeks and had engaged in a sexual relationship that continued "after the official break up [*sic*] of the full relationship" until the date of the incident. *Irvine*, 379 Ill. App. 3d at 118. The court held that this evidence was sufficient to show that the two had a "dating relationship" under the Code. The defendant asked the court to rely on our cases to conclude that his relationship with the victim was not a "serious courtship." *Irvine*, 379 Ill. App. 3d at 123. The court rejected defendant's argument, based in part on the ongoing sexual relationship between the two:

> "We *** find that the relationship between [the victim] and the defendant qualifies as a serious courtship because they dated for six weeks and continued to have sexual intercourse up to and including the date of their altercation. *** When we consider the evidence in the light most favorable to the State, we hold that the evidence established that the defendant and [the victim's] relationship was a 'dating relationship' because it was neither a casual acquaintanceship nor ordinary fraternization between two individuals in a business or social context." *Irvine*, 379 Ill. App. 3d at 125.

¶ 20     Given our recognition of the difficulty of proving that two people have shared an expectation of growth, which is just one element of the eight or so elements of *Oriola*'s elaborate definition of a "dating relationship," we will not adopt that definition as defendant would have us do. Further, each of the additional elements in that definition compounds the difficulty of proving

the existence of a dating relationship. As we stated, the *Oriola* definition would require the State to prove "a [(1)] social relationship between two individuals [(2)] who have or have had a [(3)] reciprocally [(4)] amorous and [(5)] increasingly exclusive interest in one another, and [(6)] shared expectation of the growth of that mutual interest, [(7)] that has endured for such a length of time and [(8)] stimulated such frequent interactions that the relationship cannot be deemed to have been casual." *Oriola*, 100 Cal. Rptr. 2d at 832-33. Although we found the *Oriola* court's sociological discussion of dating valuable, its definition is more plausible as a description of a *model* dating relationship than a workable statement of the *minimum* characteristics of such a relationship. Therefore, when we said in *Alison C.* that a " 'dating relationship' " means "a serious courtship, like that discussed in *Oriola*" (*Alison C.*, 343 Ill. App. 3d at 653), we should be understood as saying that the relationship falls within a range of relations that find their "ideal" in the definition in *Oriola*. The point was to distinguish "serious courtships" from casual, nascent, or potential relationships, such as that between the plaintiff and the defendant in *Alison C.*

¶ 21    Under the rule in *Young*, the State had to prove that defendant's relationship with A.R. was a "serious courtship": "at a minimum, an established relationship with a significant romantic focus." *Young*, 362 Ill. App. 3d at 851. But "romantic" must be interpreted in the broad sense that we intended, which encompasses relationships that are "romantic" in a conventional sense *and* those that are mainly sexual. We need not address here whether we would deem a sexual relationship without any element of companionship to be a "dating relationship." Here, A.R. testified that she and defendant spent time together watching movies, so a reasonable trier of fact could find that companionship was an aspect of the relationship. Beyond that, we agree with defendant that it does not make sense to deem a relationship to be a "dating relationship" unless a degree of romantic reciprocity is present. If one party is merely the object of desire, then, even if

a social relationship exists between the desired person and the desirous person, there is no dating relationship.

¶ 22    On the other hand, contrary to the implications of *Oriola*, we do not require complete reciprocity of interest. To disqualify a relationship in which, for example, one party is seeking sex and the other a chocolate-and-flowers romance is to take too narrow a view. Ill-matched couples may nevertheless be couples.

¶ 23    Applying these principles to this case and viewing the evidence in the light most favorable to the State, we hold that defendant and A.R. were in "an established relationship with a significant romantic focus." *Young*, 362 Ill. App. 3d at 851. If, as defendant suggested, A.R. wanted a "boyfriend" and he wanted sex, we deem that this mismatch of desires does not preclude their having a dating relationship. Moreover, the jury was entitled to believe A.R.'s testimony that she and defendant spent time together outside of their sexual relationship. According to A.R., the two not only met to have sex but regularly ate together and watched movies at defendant's house and had done so "on and off" for about eight months before the incident. This relationship, as described by A.R., was a "serious courtship" within the meaning of *Young*. We thus conclude that the evidence was sufficient for a reasonable trier of fact to conclude that defendant was in a "dating relationship" with A.R. within the meaning of section 12-0.1 of the Code.

¶ 24                                III. CONCLUSION

¶ 25    For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 26    Affirmed.

---

**No. 2-18-0473**

---

| | |
|---|---|
| **Cite as:** | *People v. Allen*, 2020 IL App (2d) 180473 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Stephenson County, No. 17-CM-626; the Hon. James M. Hauser, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Elena B. Penick, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Carl H. Larson, State's Attorney, of Freeport (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---