832 A.2d 379 (2003)
363 N.J. Super. 252
Rashawn ANDREWS Plaintiff,
v.
Lotoya RUTHERFORD Defendant.
Superior Court of New Jersey, Chancery Division.
May 1, 2003.
*380 Dina Avila-Jimenez, Glassboro, for plaintiff (South Jersey Legal Services, Inc., attorneys).
Gregory Williams, for defendant (Sumners George, P.C., attorneys).
HOGAN, J.S.C.
Before the court is the question of what constitutes a "dating relationship"? This question is raised in the context of the New Jersey Domestic Violence Act, N.J.S.A. 2C:25-17 et seq. The answer to this question is important, as in the instant case plaintiff's ability to obtain a hearing for a final restraining order is dependant on an affirmative finding. Plaintiff alleges that jurisdiction for the court to consider this matter is authorized because he and defendant were involved in a dating relationship at the time of the alleged domestic violence. Defendant denies that she had a dating relationship with plaintiff and argues that the court has no authority to proceed.
The New Jersey domestic violence statutes do not define in any manner what is a dating relationship, or what factors a court should consider in making such a determination where that issue is contested. Likewise, there is no reported New Jersey decision that answers the question: "What is a dating relationship?"
The complaint in this matter was filed on February 6, 2003, and a temporary restraining order was entered on the same date. On February 24, 2003, a hearing was conducted to ascertain both whether this court had jurisdiction and whether an act of domestic violence had occurred that would then warrant a final restraining order. At the hearing, plaintiff was not represented by counsel, but defendant did have counsel at her side.
At the outset, defendant's counsel argued that the court could not proceed because the allegation in plaintiff's complaint that he had a dating relationship with the defendant was not true. Therefore, the court decided to take initial testimony on that issue. Plaintiff testified but did not present further witnesses. At that hearing plaintiff's mother was not permitted to testify because of defendant's objection that plaintiff's mother was not sequestered as was directed by the court. Defendant also presented the testimony of several witnesses from her extended family who supported defendant in her assertion that there was no dating relationship. At the conclusion of the testimony the court ruled that in fact no dating relationship had ever existed between these parties. Because of this finding, which excluded plaintiff from any one of the protected relationships required by the statute, plaintiff was ineligible for relief under the domestic violence statute. The complaint was dismissed and the TRO was dissolved accordingly.
On March 10, 2003, the court entertained a motion by the plaintiff for reconsideration of the dismissal of complaint. On that date plaintiff had secured counsel who brought the motion on his behalf. Defendant's counsel filed a brief in opposition, but did not appear for oral argument. The court granted the motion principally on the basis that it felt that plaintiff, who was pro se at the time of the original hearing, did not understand the sequestration of witness process and as a pro se was not prepared to defend against the motion *381 of defendant that argued no dating relationship existed between the parties.
The court ordered that there be a hearing to permit plaintiff the opportunity to present witnesses to support his contention that there was a dating relationship. The issue as to whether to reinstate the TRO was reserved until after the testimony.
The testimony of plaintiff's witnesses began on March 17, 2003, and concluded March 31, 2003. At the conclusion of that testimony, after a thorough cross-examination by defendant's counsel, and after considering the testimony of defendant's witnesses presented at the prior hearing, the court entered its determination from the bench that indeed a dating relationship existed between the parties and therefore the court had the authority under the statute to proceed with a hearing on the merits. A hearing on the merits was scheduled. At the conclusion of the hearing, the court from the bench indicated that the findings and conclusions of law for its decision that a dating relationship existed would be set forth in a written opinion. The court reinstated the temporary restraining order pending the final hearing on the question of whether a Final Restraining Order should be issued. On April 17, 2003, after the final hearing, the court in a bench decision found that plaintiff was a victim of domestic violence and an appropriate Final Restraining Order was entered.
New Jersey's Prevention of Domestic Violence Act ("Act") defines a victim of domestic violence as:
...a person protected under this act and shall include any person who is 18 years of age or older or who is an emancipated minor and who has been subjected to domestic violence by a spouse, former spouse, or any other person who is a present or former household member. "Victim of domestic violence" also includes any person, regardless of age, who has been subjected to domestic violence by a person with whom the victim has a child in common, or with whom the victim anticipates having a child in common, if one of the parties is pregnant. "Victim of domestic violence" also includes any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship. [emphasis added] N.J.S.A. 2C:25-19(d).
The plaintiff has sought the remedies available to victims of domestic violence under the Act, alleging that he and defendant were engaged in a "dating relationship". Defendant challenges this contention. Therefore, it is imperative that the court determine what constitutes a "dating relationship", as the legislature has failed to define the term within the Act.
The court must first attempt to find any legislative intent by construing the words of the Act. In New Jersey, it has generally been held that the meaning of a statute must be sought in the language in which the act is framed, and if that language is plain, the sole function of the court is to enforce that language according to its terms. See Sheeran v. Nationwide Mut. Ins. Co., Inc., 80 N.J. 548, 404 A.2d 625, (N.J.1979). However, in the absence of an explicit indication of special meaning, words of a statute are to be given their ordinary and well-understood meaning. See Levin v. Parsippany-Troy Hills Tp., 82 N.J. 174, 411 A.2d 704 (1980). Also, the nature of subject matter, contextual setting, and statutes in pari materia must all be viewed together in seeking legislative intent, and the import of a particular word or phrase is controlled accordingly. See Loboda v. Clark Tp., 40 N.J. 424, 193 A.2d 97 (1963). As it pertains to New Jersey's Prevention of Domestic Violence *382 Act, the Supreme Court has held that because the Act is remedial in nature, it is to be liberally construed to achieve its salutary purposes. See Cesare v. Cesare, 154 N.J. 394, 713 A.2d 390 (1998). In enacting the Prevention of Domestic Violence Act, the legislature intended to protect victims, not to punish a person who committed acts of domestic violence. See Carfagno v. Carfagno, 288 N.J.Super. 424, 672 A.2d 751, (Ch.Div.1995).
The conundrum in this case lies in the fact that the words "dating relationship" provoke a different "common usage" from one person to the next, and therefore any attempt to discern a universal meaning for the phrase is problematic. In this case it can certainly not be said that the Act is unambiguous on its face.[1] However, as stated in Levin, supra, a look at the Act as a whole sheds some light on what the legislature may have meant by including the term "dating relationship". It is clear that the legislature when they amended the Act in 1994 could have merely extended the act to cover those individuals who were "dating ". However to do so would have left an undefined concept even more ambiguous. The legislature specifically intended the protected individuals to be in a relationship or more clearly, a "dating relationship". Not to have included the term relationship could very well lead to the circumstance where two people meet for a lunch date or date at the movies only on one occasion. In the event one of the parties thereafter committed one of the underlying offenses set forth in the statute, a court might be required to find that the domestic violence statute applies to a situation where two individuals have a onetime casual lunch or "dinner date".
In interpreting exactly what was contemplated by inclusion of the term "relationship", the first step in the analysis would be to look at other classes of people protected by the Act. The Act provides protection to those who have a child in common with one another, people who anticipate having a child in common with one another, pregnant spouses, former spouses, and any other person who is a present or former household member. See N.J.S.A. 2C:25-19(d). These classes of people all have a continuing, frequent, and observable relationship with one another. It can also be said that the relationships involved with these other protected classes are somewhat open and notable to the public.
When the legislature added the term "dating relationship" to the list of protected persons under the Act in 1994, it followed the efforts in other states where domestic violence statutes dealt with the subject. A review of the laws of other jurisdictions in this regard demonstrates that nearly identical language exists in the statutes of several states. States that include some form of "dating relationship" as a protected class in their domestic violence statutes include Alabama, California, Massachusetts, Michigan, Nevada, Montana, North Carolina, North Dakota, Rhode Island, Tennessee, Washington, West Virginia, Illinois, and Vermont. Among all of these statutes, unlike New Jersey, several stand out as explicitly defining what constitutes a "dating relationship". In North Carolina, a dating relationship "is one wherein the parties are romantically involved over time and on a continuous basis during the course of a relationship." See N.C.Gen.Sess. § 50B-1 (2003). In Michigan, a dating relationship *383 is defined as "frequent, intimate associations primarily characterized by the expectation of affectional involvement." See Mich.Comp.Laws § 400.1511 (2003). In Vermont, "dating" is simply defined as a "social relationship of a romantic nature." See 15 Vt.Stat.Ann. 1101.
Many of these same states also incorporate factors into their statutes in order to aid the courts in determining whether a dating relationship actually exists. For instance, Massachusetts lists several factors, including the length of time of the relationship, the type of the relationship, and the frequency of interaction between the parties. See Mass.Gen.Laws.Ann. 209A, 1. Washington's factors include the length of time the relationship has existed, the nature of the relationship, and the frequency of the interaction between the parties. See Wash.Rev.Code.Ann. § 26.50.010. Perhaps the most comprehensive set of factors is contained in Vermont's statute and includes the nature of the relationship, the length of time the relationship has existed, the frequency of interaction between the parties, and the length of time since the relationship was terminated, if applicable. See 15 Vt.Stat. Ann. 1101. As is clear by a review of these statutes, a variety of states use essentially the same factors when determining the existence of a dating relationship.
However, it should also be noted that certain states expressly exclude some types of relationships from falling under their Act's umbrella. Michigan's statute provides that the term "dating relationship" does not include a "casual relationship or ordinary fraternization between two individuals in a business or social context". Mich.Comp.Laws. 400.1511. North Carolina similarly excludes "a casual acquaintance or ordinary fraternization between persons in a business or social context". N.C.Gen.Sess. § 50B-1. Tennessee and Nevada also have similar provisions. See Tenn.Code.Ann. § 36-3-601(9)(C) and Nev.Rev.Stat. § 33.108.
A case remarkably similar to the one currently before the Court was recently decided in California. California's Domestic Violence Prevention Act also fails to define what constitutes a "dating relationship". In Oriola v. Thaler, 84 Cal.App.4th 397, 100 Cal.Rptr.2d 822 (2000), the California Court of Appeals defined a "dating relationship" as a "serious courtship...a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." Id. at 412, 100 Cal.Rptr.2d 822. The court came to this definition after an exhaustive and thorough analysis of the precedent from other jurisdictions and a lengthy historical analysis of the meaning of the term "dating".
While the Oriola court set forth a comprehensive definition of what constitutes a "dating relationship", such a determination is necessarily fact sensitive and thus warrants a "factor approach" rather than a "definitional approach", similar to the approach used in Vermont, Massachusetts, and Washington. In determining whether a dating relationship actually exists under New Jersey's Prevention of Domestic Violence Act, this court finds six factors that should, at a minimum, be considered:[2] *384 1. Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?
2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?
3. What were the nature and frequency of the parties' interactions?
4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?
5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?[3]
6. Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?
While none of these factors may be individually dispositive on the issue, one or more of the factors may be more or less relevant in any given case depending on the evidence presented. In the interest of interpreting the Domestic Violence Act broadly as required by Cesare and the statute itself[4], these factors should also be liberally construed. Thus, where the issue of whether a dating relationship exists is raised by the defendant, the court should first determine whether a dating relationship actually exists in accordance with a consideration of the factors set forth above, and thereafter proceed appropriately in accordance with its findings.
Both parties presented numerous witnesses during these proceedings. For the most part the witnesses consisted of immediate family members, cousins, and friends. From the perspective of the witnesses for the defendant there was no dating relationship, only a casual acquaintance between the parties, mostly at group gatherings of mutual friends. From the perspective of plaintiff's witnesses, the relationship was far more intimate, even involving the parties sleeping together. In some respects while the testimony of the two sides on the surface seemed inconsistent, and indeed much of it was, the court observes that often the various witness were relating their observations of the parties under differing circumstances and locations. Thus, on this dating issue, both sides' witnesses were conveying the facts as they understood them. In fact, the court finds the parties did not hold themselves out as a dating couple in the presence of the defendant's family and immediate friends. However, they did demonstrate a dating relationship in front of plaintiff's family and their immediate friends.
What is clear from the evidence is that defendant had a boyfriend named David. That, at the same time she had this relationship, in October of 2002 defendant was introduced to the plaintiff by Monica Little, the cousin of plaintiff. The parties exchanged telephone numbers and over the next several months they were together "a lot", as many as fifteen (15) times according to Ms. Little. Ms. Little saw the parties hugging and kissing in her presence and said that they were often affectionate. While there were certain inconsistencies with Ms. Little's testimony on certain details, and she did not believe the parties had a "serious" relationship, she did perceive them as a dating couple. When viewed in the light of the other testimony that tended to corroborate her *385 overall testimony, the court is satisfied with the overall veracity of Ms Little.[5]
Plaintiff testified that the "relationship" lasted from October 2002 until February 2003, and that the parties would go to dinner on occasion and spend time together. The parties, he said, also had a sexual relationship.
Plaintiff's mother stated that defendant had visited at her home with her son several times, sometimes having dinner, and that defendant was the first female friend her son had brought home to meet the family in four years. Plaintiff's mother also testified that she saw her son and defendant "hugged up" with his arm around her upstairs in her computer room and holding hands. The evidence included photos that show plaintiff and defendant in that room, one with defendant's head on plaintiff's shoulder. Plaintiff called other witnesses whose testimony supports the contention that a dating relationship existed, including testimony that the parties had stayed together overnight on occasion.
Any doubt of whether a dating relationship existed is removed by virtue of a videotape[6] taken on New Year's Eve, December 31, 2002, in a hotel suite at 3:30 am, which clearly shows the parties enjoying themselves on a couch in what can be described as a party atmosphere. Plaintiff and defendant were together in the hotel suite with two other couples. The three couples slept in the suite and left the hotel together in the morning. It is important to note that defendant and plaintiff did not arrive together at the hotel, but instead defendant arrived by herself at about 2:15 a.m.[7]
Defendant's witnesses, who included her sister, her mother, and her father, testified strongly that defendant was not dating plaintiff and in fact already had a boyfriend. However, defendant's sister, while pointing out that defendant has had a boyfriend, David, for two years, admitted that plaintiff and defendant were "friends" but not dating, a point her other witnesses did not acknowledge though they professed to know defendant well. On rebuttal, plaintiff testified that defendant hid their relationship from her family and in fact they had spent the night together on several occasions. Defendant did not initially testify until the hearing on the merits of the domestic violence complaint. While her testimony occurred after the hearing concerning the dating relationship, it is still fair to point out that she denied any relationship with the plaintiff.
After examining this matter in light of the "factors" discussed above, the following findings in addition to those above are made:

*386
Was there a minimum social The evidence clearly
interpersonal bonding of the demonstrates that between
parties over and above a mere October 2002 and February
casual fraternization? 2003 the parties saw each
 other regularly, and in fact
 spent occasional nights with
 each other, including New
 Year's Eve. These were not
 casual meetings, as they
 demonstrated a clear
 attraction to one another as
 shown by the photography in
 evidence.
How long did the alleged The parties first met in
dating activities continue October of 2002 and had
prior to the alleged acts of regular dating interactions
domestic violence? until February of 2003.
What was the nature and The parties attended numerous
frequency of the interaction activities with other friends
between the parties? and visited with the
 plaintiff's family and
 friends. The parties
 conducted a level of romantic
 activity that included
 spending the night together
 on more than one occasion.
What were the parties The evidence does not show
expectations with respect to that the parties expected
the relationship either their dating to result in a
individually or jointly? permanent relationship. Both
 parties are young, and the
 defendant already had a two-year
 relationship with
 another person. The
 plaintiff likewise
 demonstrated no future
 expectations of a permanent
 relationship. The parties'
 expectations were to carry on
 a romantic relationship with
 no long-term commitment as
 demonstrated by their
 conduct.
Did the parties demonstrate The parties held themselves
an affirmation by statement out as a dating couple to the
or conduct of their family and friends of the
relationship before others? plaintiff, but because of the
 fact that the defendant also
 had a relationship with
 another individual who was
 well known to her family, the
 activities of the plaintiff
 and defendant were not
 disclosed to her family.
Are there any other findings None
unique to the matter that
either supports or detracts
from a conclusion that a
dating relationship exist?

As exhibited above the parties had a social interpersonal bonding between them that went far beyond mere fraternization. This bonding was forged over a several *387 month period involving the typical conduct of young people who are exploring the limits of each other's feelings for one another. While it is clear that the relationship had not reached the level of a lifetime commitment, it need not have to for the purpose of establishing the minimum conduct to establish a dating relationship required by the Prevention of Domestic Violence Act.
Even though plaintiff and defendant only held themselves out as a dating couple to plaintiff's family and friends, that is sufficient. As suggested in a previous footnote, the fact that the parties, or one of the parties, chooses not to disclose the relationship to certain individuals in no way provides a bar to the court from finding that a dating relationship exists. The holding out to others by statement or conduct is a factor that supports the concept that a relationship exists, and it is not a factor that if found in the negative would independently bar a finding of such relationship, absent appropriate findings after applying the evidence to the remaining factors.
While a dating relationship normally has an expectation of romance, it is not an absolute. In the present case the parties were romantic in their relationship, but it is conceivable that two people could date and develop a dating relationship initially on a platonic level. Each case is fact sensitive, particularly in today's world of changing norms and diverse cultures. A court must also be alert to such consideration, within the context of the sixth factor. Those unique circumstances do not present themselves in this matter.
For the reasons set forth above, the court finds that plaintiff and defendant had a dating relationship leading up to the acts of Domestic Violence in February of 2003, and therefore fall within the class of relationships intended to be covered under the New Jersey Prevention of Domestic Violence Act.
NOTES
[1] In fact, the court notes that the Merriam-Webster Dictionary rather unhelpfully defines "dating" as to go out on usually romantic dates. "Relationship" is defined as a romantic or passionate attachment.
[2] These factors are not exclusive and additional considerations may present themselves within the context of a given case.
[3] There is certainly the potential that individuals could be in a "secret" dating relationship, in which the parties intentionally go out of their way not to hold themselves out as a dating couple, in which case the other factors would logically carry more weight.
[4] See N.J.S.A. 2C:25-28, subd. a.
[5] Overall the plaintiff's witnesses were, in the Court's opinion after observing them and the reaction of the parties to the testimony, more credible. Their testimony was more specific, more certain and provided more context.
[6] Of course the standard of proof for the plaintiff is a civil preponderance of evidence standard, not the criminal beyond a reasonable doubt standard.
[7] There was testimony that on several occasions the defendant and the plaintiff would arrive separately at a function. In some contexts this fact might detract from a finding of a dating relationship. However, due to the fact that the relationship was not disclosed to defendant's family, it would seem logical that defendant would come to a social function to meet the plaintiff rather than meeting the defendant at her home.