Charles E. Hobdy was convicted of domestic violence in the second degree, a violation of § 13A-6-131, Ala. Code 1975. He was sentenced, as a habitual felony offender, to 22 years' imprisonment.
Hobdy argues that the State failed to present a prima facie case and that, therefore, the trial court erred in denying his motions for a judgment of acquittal made at the close of the State's case and at the close of all the evidence. More specifically, Hobdy argues (1) that there was no evidence indicating that he used a deadly weapon or dangerous instrument to cause physical injury to the victim and (2) that there was no evidence indicating that he and the victim were in a relationship that met the statutory requirements of the domestic-violence statute.
The undisputed evidence at trial indicated that Hobdy and the victim, Deborah Toles, lived next door to each other; that Hobdy and Toles got into an argument at Toles's residence on March 2, 2003; that Hobdy struck Toles several times during that argument, causing a head injury that bled; and that Toles was transported to the hospital by medical personnel where she remained for five days. It was further undisputed that when law-enforcement officers arrived on the scene, Hobdy was standing on his front porch yelling that Toles had stolen his money and that "he was going to kill that bitch" (R. 97) and that there was blood on Hobdy's clothes when he was arrested.
According to Toles, the argument ensued because Hobdy wanted to have sex *Page 320 
with her but she refused because her children were at her mother's house across the street and could return home at any moment. She testified that the next thing she remembered was waking up on the floor and realizing that she had been hit and was bleeding so she ran across the street to her mother's house, where she again did not remember anything until she awoke at the hospital. Toles also stated that she knew Hobdy frequently carried a knife or box cutter.
According to witnesses for the State, in addition to suffering numerous bruises, Toles was bleeding profusely from a laceration above her right eye and two lacerations on the back of her head; the testimony further indicated that the bandages on her head had to be replaced repeatedly as her injuries continued to bleed and that her head was swollen so badly that the two lacerations on the back of her head weren't located until a day or two later when the swelling began to subside, at which time those lacerations were closed with stitches.
Both at the scene as he was being arrested and later during a taped interview with the police, Hobdy claimed that Toles had stolen money from him. At trial, Hobdy testified that he had had $60 in his wallet and $10 in his front pocket when he arrived at Toles's house that day; according to Hobdy, he dozed off and when he woke up, he realized that $40 was missing from his wallet. Hobdy conceded that he confronted Toles about the money and that he hit her three or four times, but denied cutting her or hitting her with anything other than his bare hands.
Section 13A-6-131, Ala. Code 1975, provides, in pertinent part:
 "(a) A person commits the crime of domestic violence in the second degree if the person commits the crime of assault in the second degree pursuant to Section 13A-6-21, and the victim is a . . . person who has or had a dating . . . relationship with the defendant."
Section 13A-6-21, Ala. Code 1975, which defines the offense of assault in the second degree, provides, in pertinent part:
 "(a) A person commits the crime of assault in the second degree if the person does any of the following:
". . . .
 "(2) With intent to cause physical injury to another person, he or she causes physical injury to any person by means of a deadly weapon or a dangerous instrument."
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State,720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quoting Faircloth v. State,471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493
(Ala. 1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v. State, 602 So.2d 462, 464
(Ala.Crim.App. 1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'"Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App. 1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence *Page 321 
is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040,1042 (Ala. 1978).
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039
(5th Cir. 1974); United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir. 1961).
 "`[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir. 1969); Roberts v. United States, 416 F.2d 1216
(5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855
(5th Cir. 1967):
 "`"Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry's words, "`"`. . . the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury might reasonably so conclude.' Williamson v. United States, 5th Cir., 1966, 365 F.2d 12, 14. (Emphasis supplied)."
 "`The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged.' McGlamory, 441 F.2d at 135 and 136."
Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Crim.App. 1978).
 I.
Hobdy first argues that his motions for a judgment of acquittal should have been granted because, he claims, the State did not present sufficient evidence indicating that he struck Toles with a deadly weapon or dangerous instrument.
Toles testified that, although she did not know what Hobdy struck her with or even remember the actual blows, Hobdy "always carried" what she characterized as a "box razor, razor, box cutter" (R. 35), and she answered affirmatively when asked whether he also usually carried a knife. Additionally, there was extensive testimony regarding the nature and severity of Toles's injuries, and the evidence indicated that Hobdy had blood on his clothing at the time of his arrest and that he had a knife and box cutter in his pocket at the time of his arrest. Despite the fact that Toles could not testify as to the exact cause of her injuries, and despite Hobdy's denial that he hit Toles with any object *Page 322 
other than his hands, the jury could have reasonably inferred from the testimony and the evidence that Hobdy struck Toles with a dangerous instrument or deadly weapon. Thus, the trial court did not err in denying Hobdy's motions for a judgment of acquittal on this ground. See Humphrey v. State, 833 So.2d 679
(Ala.Crim.App. 2002).
 II.
Hobdy also argues that the State did not present sufficient evidence to establish that he and Toles "ha[v]e or had a dating" relationship as set out in § 13A-6-131.[1]
Toles testified that she and Hobdy had a relationship; that they saw each other on the weekends; that they were sexually involved; that their relationship was a romantic one; that she cooked dinner for him on several occasions; and that the relationship had been ongoing for approximately one year at the time of the attack. She characterized the relationship as seeing each other, but not exclusively, but she later clarified that statement, stating that she was not having sexual relations with anyone other than Hobdy during that time frame and when she said their relationship was not exclusive she meant only that she had male friends come by to visit and talk. Although Toles characterized the relationship as "nothing serious" (R. 25), and testified that she and Hobdy were "not dating," she indicated that she considered "dating" to be a situation where two people actually went out somewhere, and that, rather than go out on "dates," she and Hobdy would just stay at one of their houses. (R. 26.)
Further, we note the following excerpt from the transcript of Hobdy's statement to police:
 "[Officer] Williams: Are you and her seeing each other, are y'all boyfriend and girlfriend?
 "Hobdy: [inaudible] [sic] she been getting my money. I been losin' money every time she hang around me I always lose, I always missing my money.
 "[Officer] Williams: Are y'all seeing each other though?
 "Hobdy: Oh yeah, we have been dating each other and all that.
 "[Officer] Williams: Okay. How long have y'all been dating?
 "Hobdy: Well, ever since she's been back up here I reckon. I . . .
"[Officer] Williams: Bout how long has that been?
 "Hobdy: Well I think she come back in '89 something, she come back up here in '89.
"[Officer] Williams: So it's been quite some time?
"Hobdy: Yeah."
(C. 147.) Later during the statement, Hobdy reconfirmed that he thought they had been dating since 1989, but that "[w]e just see each other every now and then, like I say it ain't no final thang [sic]." (C. 149.)
Section 13A-6-131, Ala. Code 1975, does not define a "dating relationship," and our research has not uncovered any other statute or any caselaw in Alabama defining that term. Thus, the term "dating relationship" must be given its "`natural, plain, ordinary, and commonly understood meaning.'" Perry v. State,568 So.2d 339, 342 (Ala.Crim.App. 1990), quoting Alabama FarmBureau Mut. Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219,1223 (Ala. 1984). "Date" is defined, in relevant context, as "a social engagement between two persons *Page 323 
that often has a romantic character . . . a person with whom one has a usu. romantic date." Merriam-Webster's CollegiateDictionary 317 (11th ed. 2003). "Relationship" is defined, in relevant context, as "a romantic or passionate attachment."Merriam-Webster's Collegiate Dictionary 1050 (11th ed. 2003).
However, as the Superior Court of New Jersey, Chancery Division, noted in Andrews v. Rutherford, 363 N.J.Super. 252,256-57, 832 A.2d 379, 382 (Ch.Div. 2003), "[t]he conundrum in this case lies in the fact that the words `dating relationship' provoke a different `common usage' from one person to the next, and therefore any attempt to discern a universal meaning for the phrase is problematic." In Andrews, the New Jersey Court addressed the term "dating relationship" with regard to the applicable New Jersey statute codifying the offense of domestic violence, as follows:
 "When the legislature added the term `dating relationship' to the list of protected persons under the Act in 1994, it followed the efforts in other states where domestic violence statutes dealt with the subject. A review of the laws of other jurisdictions in this regard demonstrates that nearly identical language exists in the statutes of several states. States that include some form of `dating relationship' as a protected class in their domestic violence statutes include Alabama, California, Massachusetts, Michigan, Nevada, Montana, North Carolina, North Dakota, Rhode Island, Tennessee, Washington, West Virginia, Illinois, and Vermont. Among all of these statutes, unlike New Jersey, several stand out as explicitly defining what constitutes a `dating relationship.' In North Carolina, a dating relationship `is one wherein the parties are romantically involved over time and on a continuous basis during the course of a relationship.' See N.C.Gen.Sess. § 50B-1 (2003). In Michigan, a dating relationship is defined as `frequent, intimate associations primarily characterized by the expectation of affectional involvement.' See Mich.Comp. Laws § 400.1511 (2003). In Vermont, `dating' is simply defined as a `social relationship of a romantic nature.' See 15 Vt.Stat.Ann. 1101.
 "Many of these same states also incorporate factors into their statutes in order to aid the courts in determining whether a dating relationship actually exists. For instance, Massachusetts lists several factors, including the length of time of the relationship, the type of the relationship, and the frequency of interaction between the parties. See Mass.Gen.Laws.Ann. 209A, 1. Washington's factors include the length of time the relationship has existed, the nature of the relationship, and the frequency of the interaction between the parties. See Wash.Rev.Code.Ann. § 26.50.010. Perhaps the most comprehensive set of factors is contained in Vermont's statute and includes the nature of the relationship, the length of time the relationship has existed, the frequency of interaction between the parties, and the length of time since the relationship was terminated, if applicable. See 15 Vt.Stat.Ann. 1101. As is clear by a review of these statutes, a variety of states use essentially the same factors when determining the existence of a dating relationship.
 "However, it should also be noted that certain states expressly exclude some types of relationships from falling under their Act's umbrella. Michigan's statute provides that the term `dating relationship' does not include a `casual relationship or ordinary fraternization between two individuals in a business or social context'. Mich.Comp.Laws. 400.1511. North Carolina similarly excludes `a casual acquaintance or ordinary fraternization *Page 324 
between persons in a business or social context'. N.C.Gen.Sess. § 50B-1. Tennessee and Nevada also have similar provisions. See Tenn.Code.Ann. § 36-3-601(9)(C) and Nev.Rev.Stat. § 33.108.
 "A case remarkably similar to the one currently before the Court was recently decided in California. California's Domestic Violence Prevention Act also fails to define what constitutes a `dating relationship.' In Oriola v. Thaler, 84 Cal. App.
4th 397, 100 Cal.Rptr.2d 822 (2000), the California Court of Appeals defined a `dating relationship' as a `serious courtship . . . a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual.' Id. at 412, 100 Cal.Rptr.2d 822. The court came to this definition after an exhaustive and thorough analysis of the precedent from other jurisdictions and a lengthy historical analysis of the meaning of the term `dating.'
 "While the Oriola court set forth a comprehensive definition of what constitutes a `dating relationship', such a determination is necessarily fact sensitive and thus warrants a `factor approach' rather than a `definitional approach,' similar to the approach used in Vermont, Massachusetts, and Washington. In determining whether a dating relationship actually exists under New Jersey's Prevention of Domestic Violence Act, this court finds six factors that should, at a minimum, be considered:²
 "1. Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?
 "2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?
 "3. What were the nature and frequency of the parties' interactions?
 "4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?
 "5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?³
 "6. Are there any other reasons unique to the case that support or detract from a finding that a `dating relationship' exists?
 "While none of these factors may be individually dispositive on the issue, one or more of the factors may be more or less relevant in any given case depending on the evidence presented. . . . Thus, where the issue of whether a dating relationship exists is raised by the defendant, the court should first determine whether a dating relationship actually exists in accordance with a consideration of the factors set forth above, and thereafter proceed appropriately in accordance with its findings.
"___________________________________________
 "² These factors are not exclusive and additional considerations may present themselves within the context of a given case.
 "³ There is certainly the potential that individuals could be in a `secret' dating relationship, in which the parties intentionally go out of their way not to hold themselves out as a dating couple, in which case the other factors would logically carry more weight."
363 N.J.Super. at 257-60, 832 A.2d at 382-84.
We believe that the six criteria set forth in Andrews provide a general framework for making the determination as to whether a "dating relationship" exists under *Page 325 
the domesticviolence statutes in Alabama.[2] That framework, however, is not exhaustive, but rather must allow for the consideration of additional facts and/or factors that may be relevant and that may arise in the context of a future case. Thus, what constitutes a dating relationship for purposes of the domestic-violence statute must be determined by the fact-finder on a case-by-case basis.
In this case, the evidence, viewed in the light most favorable to the State, could have supported the jury's inference that Hobdy and Toles were involved in a dating relationship for purposes of the domestic-violence statute. There was testimony that the relationship had been ongoing for more than a year, during which time Hobdy and Toles routinely engaged in sexual relations. The relationship was ongoing at the time of the attack, so there was no gap in time to be considered. Hobdy and Toles lived next door to each other, and the testimony indicated that, although they did not outwardly affirm their relationship by going out to movies, dinner, or other social gatherings, they interacted almost every weekend. Additionally, despite Hobdy's statement that the relationship was not a "final thang" (C. 149), and Toles's statement that their relationship was not mutually exclusive, each of their descriptions of the relationship suggested that it was far more than casual in nature. Further, Toles clarified that she was not having sexual relations with anyone other than Hobdy. Thus, the trial court did not err in denying Hobdy's motions for a judgment of acquittal on this ground.
Moreover, to the extent that Hobdy argues that there was conflicting testimony as to the nature and extent of the alleged relationship between him and Toles, it is well-settled that any "inconsistencies and contradictions in the State's evidence, as well as [any] conflict between the State's evidence and that offered by the appellant, [goes] to the weight of the evidence and [creates a question] of fact to be resolved by the jury."Rowell v. State, 647 So.2d 67, 69-70 (Ala.Crim.App. 1994). "`"[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."'"Johnson v. State, 555 So.2d 818, 820 (Ala.Crim.App. 1989), quoting Harris v. State, 513 So.2d 79, 81 (Ala.Crim.App. 1987), quoting in turn Byrd v. State, 24 Ala.App. 451, 451,136 So. 431, 431 (1931). "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." Johnson, 555 So.2d at 820. "`When the jury has passed on the credibility of evidence tending to establish the defendant's guilt, this Court cannot disturb its finding.'"Rowell, 647 So.2d at 69, quoting Collins v. State,412 So.2d 845, 846 (Ala.Crim.App. 1982). Furthermore, "`[t]his Court must view the evidence in the light most favorable to the State, and "draw all reasonable inferences and resolve all credibility choices in favor of the trier of fact."'" D.L. v. State,625 So.2d 1201, 1204 (Ala.Crim.App. 1993), quoting Woodberry v.State, 497 So.2d 587, 590 (Ala.Crim.App. 1986). "Any issues regarding the weight and credibility of the evidence are not reviewable on appeal once the state has made a prima facie case."Jones v. State, 719 So.2d 249, 255 (Ala.Crim.App. 1996), aff'd, 719 So.2d 256 (Ala. 1998).
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] In light of the evidence presented at trial, of the list of possible relationships set forth in the domestic-violence statute, a dating relationship is the only type of relationship a jury could have found in this case.
[2] Section 13A-6-130 et seq., Ala Code 1975. *Page 326