The appellant, Scottie Lee Brand, was convicted of third-degree domestic violence (harassment), a violation of §13A-6-132, Ala. Code 1975. The trial court sentenced him to serve a term of twelve months at hard labor in the county jail, but suspended the sentence and placed him on unsupervised probation for twenty-four months. The appellant filed a "Motion for Post-Conviction Judgment of Acquittal," which the trial court summarily denied. This appeal followed.
The victim, Drenda Holcomb, testified that she and the appellant met in the summer of 2003; that they hung out together, went to movies together, and went places together; that she went to his house; that they were friends; and that their relationship was not and had not ever been romantic. She also testified that, on July 30, 2005, she and the appellant went to a strip club together around 11:00 p.m.; that, while they were there, another male talked to her, and another female talked to the appellant; that the appellant, who had been drinking heavily, became enraged and jealous when she talked to the other male, told her not to talk to the male, and asked the male if he wanted to go outside; and that they left around 2:00 a.m.
The victim testified that, afterward, she drove the appellant home and that, while they were on their way, the appellant was cursing at her and calling her a "bitch." At one point, she slammed on the brakes and told the appellant to get out of the vehicle, but he did not do so. The victim further testified that, when they arrived at his house, the appellant took the keys out of the ignition of her vehicle and threw them into the yard; that she got out of the vehicle to look for her keys; that the appellant yelled at her, called her a "bitch," and told her that was what she deserved; and that she got back into her vehicle and said that she just wanted her keys. Finally, she testified that the appellant, who was standing outside of the driver's side door, took her head in his hands and headbutted her.
Without cross-examining the victim, the defense moved to dismiss the charge, arguing that the victim and the appellant were friends, were not romantically involved, and were not included in the domestic violence statute. The trial court asked the victim if she and the appellant had dated, and the victim said that they had gone out together and hung out together but had not dated and had not been boyfriend and girlfriend.
Defense counsel then cross-examined the victim, who testified that she and the appellant met approximately two years before at a bar in Decatur and that they had had sexual relations that night. Afterward, the trial court told defense counsel he should not be asking such questions because "what they did in Decatur two years ago has no consequence in a trial today." Finally, the victim admitted that the appellant talked to another female at the strip club, but she stated that it did not upset her. *Page 750 
The appellant testified that, when they arrived at his house, he got the victim's keys and threw them; that he got out of the vehicle and walked to the driver's side of the vehicle; that the victim hit him and then he headbutted her; and that the victim was arguing about him talking to the girl at the strip club. He explained that he threw the victim's keys because she was arguing with him all of the way home about talking to the other female. Finally, he testified that he did not remember an argument at the strip club.
After the defense rested, the trial court stated:
 "My way of thinking, and I'm just an old 58-year-old man. You go out and have sex, you're on a date. This is old school. That's a dating relationship. They had a dating relationship. . . ."
The appellant argues that the trial court erroneously denied his "Motion for Post-Conviction Judgment of Acquittal." Specifically, he contends that the State did not establish that he and the victim were in a dating relationship.
 "A person commits domestic violence in the third degree if the person commits the crime of . . . harassment pursuant to subsection (a) of Section 13A-11-8; and the victim is a current or former spouse, parent, child, any person with whom the defendant has a child in common, a present or former household member, or a person who has or had a dating or engagement relationship with the defendant."
§ 13A-6-132(a), Ala. Code 1975.
 "A person commits the crime of harassment if, with intent to harass, annoy, or alarm another person, he or she either:
 "a. Strikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical abuse."
§ 13A-11-8(a)(1), Ala. Code 1975.
 "Section 13A-6-131, Ala. Code 1975, does not define a `dating relationship,' and our research has not uncovered any other statute or any caselaw in Alabama defining that term. Thus, the term `dating relationship' must be given its `"natural, plain, ordinary, and commonly understood meaning."' Perry v. State, 568 So.2d 339, 342 (Ala.Crim.App. 1990), quoting Alabama Farm Bureau Mut. Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219, 1223
(Ala. 1984). `Date' is defined, in relevant context, as `a social engagement between two persons that often has a romantic character . . . a person with whom one has a usu. romantic date.' Merriam-Webster's Collegiate Dictionary 317 (11th ed.2003). `Relationship' is defined, in relevant context, as `a romantic or passionate attachment.' Merriam-Webster's Collegiate Dictionary 1050 (11th ed.2003).
 "However, as the Superior Court of New Jersey, Chancery Division, noted in Andrews v. Rutherford, 363 N.J.Super. 252, 256-57, 832 A.2d 379, 382 (Ch.Div. 2003), `[t]he conundrum in this case lies in the fact that the words "dating relationship" provoke a different "common usage" from one person to the next, and therefore any attempt to discern a universal meaning for the phrase is problematic' In Andrews, the New Jersey Court addressed the term `dating relationship' with regard to the applicable New Jersey statute codifying the offense of domestic violence, as follows:
 "`When the legislature added the term "dating relationship" to the list of protected persons under the Act in 1994, it followed the efforts in other states where domestic violence statutes dealt with the subject. A review of the laws of other jurisdictions in this regard demonstrates that nearly identical language exists in the statutes of several states. States that *Page 751 
include some form of "dating relationship" as a protected class in their domestic violence statutes include Alabama, California, Massachusetts, Michigan, Nevada, Montana, North Carolina, North Dakota, Rhode Island, Tennessee, Washington, West Virginia, Illinois, and Vermont. Among all of these statutes, unlike New Jersey, several stand out as explicitly defining what constitutes a "dating relationship." In North Carolina, a dating relationship "is one wherein the parties are romantically involved over time and on a continuous basis during the course of a relationship." See N.C. Gen. Sess. § 50B-1 (2003). In Michigan, a dating relationship is defined as "frequent, intimate associations primarily characterized by the expectation of affectional involvement." See Mich. Comp. Laws § 400.1511 (2003). In Vermont, "dating" is simply defined as a "social relationship of a romantic nature." See 15 Vt. Stat. Ann. 1101.
 "`Many of these same states also incorporate factors into their statutes in order to aid the courts in determining whether a dating relationship actually exists. For instance, Massachusetts lists several factors, including the length of time of the relationship, the type of the relationship, and the frequency of interaction between the parties. See Mass. Gen. Laws. Ann. 209A, 1. Washington's factors include the length of time the relationship has existed, the nature of the relationship, and the frequency of the interaction between the parties. See Wash. Rev. Code. Ann. § 26.50.010. Perhaps the most comprehensive set of factors is contained in Vermont's statute and includes the nature of the relationship, the length of time the relationship has existed, the frequency of interaction between the parties, and the length of time since the relationship was terminated, if applicable. See 15 Vt. Stat. Ann. 1101. As is clear by a review of these statutes, a variety of states use essentially the same factors when determining the existence of a dating relationship.
 "`However, it should also be noted that certain states expressly exclude some types of relationships from falling under their Act's umbrella. Michigan's statute provides that the term "dating relationship" does not include a "casual relationship or ordinary fraternization between two individuals in a business or social context". Mick. Comp. Laws
400.1511. North Carolina similarly excludes "a casual acquaintance or ordinary fraternization between persons in a business or social context". N.C. Gen. Sess. § 50B-1. Tennessee and Nevada also have similar provisions. See Tenn.Code. Ann.
§ 36-3-601(9)(C) and Nev.Rev. Stat. § 33.108.
 "`A case remarkably similar to the one currently before the Court was recently decided in California. California's Domestic Violence Prevention Act also fails to define what constitutes a "dating relationship." In Oriola v. Thaler, 84 Cal.App.4th 397, 100 Cal.Rptr.2d 822 (2000), the California Court of Appeals defined a "dating relationship" as a "serious courtship . . . a social relationship between two individuals who have or have had a reciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." Id. at 412, *Page 752 100 Cal. Rptr.2d 822. The court came to this definition after an exhaustive and thorough analysis of the precedent from other jurisdictions and a lengthy historical analysis of the meaning of the term "dating."
 "`While the Oriola court set forth a comprehensive definition of what constitutes a "dating relationship", such a determination is necessarily fact sensitive and thus warrants a "factor approach" rather than a "definitional approach," similar to the approach used in Vermont, Massachusetts, and Washington. In determining whether a dating relationship actually exists under New Jersey's Prevention of Domestic Violence Act, this court finds six factors that should, at a minimum, be considered:[2]
 `"1. Was there a minimal social interpersonal bonding of the parties over and above a mere casual fraternization?
 "`2. How long did the alleged dating activities continue prior to the acts of domestic violence alleged?
 "`3. What were the nature and frequency of the parties' interactions?
 "`4. What were the parties' ongoing expectations with respect to the relationship, either individually or jointly?
 "`5. Did the parties demonstrate an affirmation of their relationship before others by statement or conduct?[3]
 "`6. Are there any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists?
 "`While none of these factors may be individually dispositive on the issue, one or more of the factors may be more or less relevant in any given case depending on the evidence presented. . . . Thus, where the issue of whether a dating relationship exists is raised by the defendant, the court should first determine whether a dating relationship actually exists in accordance with a consideration of the factors set forth above, and thereafter proceed appropriately in accordance with its findings.
 "`___
 "`[2] These factors are not exclusive and additional considerations may present themselves within the context of a given case.
 "`[3] There is certainly the potential that individuals could be in a "secret" dating relationship, in which the parties intentionally go out of their way not to hold themselves out as a dating couple, in which case the other factors would logically carry more weight.'
"363 N.J.Super. at 257-60, 832 A.2d at 382-84.
 "We believe that the six criteria set forth in Andrews provide a general framework for making the determination as to whether a `dating relationship' exists under the domestic-violence statutes in Alabama. That framework, however, is not exhaustive, but rather must allow for the consideration of additional facts and/or factors that may be relevant and that may arise in the context of a future case. Thus, what constitutes a dating relationship for purposes of the domestic-violence statute must be determined by the fact-finder on a case-by-case basis."
Hobdy v. State, 919 So.2d 318, 322-25
(Ala.Crim.App. 2005) (footnote omitted).
This is the second case to address what constitutes a dating relationship in Alabama. Therefore, we will examine the facts of this case in light of each of the factors set forth inHobdy. *Page 753 
First, we must determine whether there was a minimal social interpersonal bonding of the parties over and above a mere casual fraternization. Even assuming that the night the victim and the appellant met and had sexual relations constituted interpersonal bonding over and above a mere casual fraternization, the testimony does not establish that their subsequent activities constituted anything other than mere casual fraternization. Although the victim testified that she and the appellant hung out together, that they went to movies and other places together, and that she went to his house, she specifically stated that their relationship was not and had not ever been romantic. In fact, the activities the victim described, without more, are no more than what many friends engage in on a regular basis. Therefore, this factor weighs against a finding that the victim and the appellant were in a dating relationship.
Second, we must determine how long the alleged dating activities continued prior to the acts of domestic violence alleged. Under the facts of this case, this factor goes hand in hand with the first factor. As we explained in the previous paragraph, the only activity the victim and the appellant engaged in that might constitute more than mere casual fraternization, and that might therefore be characterized as a dating activity, was when they engaged in sexual relations two years before on the night they met. It appears that the trial court found the appellant guilty of third-degree domestic violence based on harassment simply because he and the victim had sexual relations the night they met. However, as the court aptly noted during defense counsel's cross-examination of the victim: "What they did in Decatur two years ago has no consequence in a trial today." Even assuming that the night the victim and the appellant met and had sexual relations constituted a dating activity, there was evidence of only one such incident, and that incident occurred approximately two years before the act of domestic violence alleged. Further, the victim specifically stated that their relationship was not and had not ever been romantic. In light of the remote and isolated nature of the parties' sexual encounter, and the lack of evidence that they subsequently engaged in activities that could be characterized as dating activity, this factor weighs against a finding that the victim and the appellant were in a dating relationship. See Alison C. v. Westcott,343 Ill.App.3d 648, 798 N.E.2d 813, 278 Ill.Dec. 429 (2003) (holding that the fact that the parties attended the same high school, had spoken on the telephone, and had a single lunch date was not sufficient to establish a dating relationship).
Third, we must examine the nature and frequency of the parties' interactions. The victim testified that she and the appellant hung out together, that they went to movies and other places together, and that she went to his house. However, she did not describe how frequently such interactions occurred. In addition, she specifically denied that she and the appellant had ever dated. Therefore, this factor does not weigh in favor of a finding that the victim and the appellant were in a dating relationship.
Fourth, we must determine what were the parties' ongoing expectations with respect to the relationship, either individually or jointly. The testimony provided little or no evidence that either the victim or the appellant had ongoing expectations with respect to the relationship. Although the appellant contended that the victim was upset about him talking to another female at the strip club, the victim testified unequivocally that she and the appellant were not boyfriend and girlfriend, that they had not ever dated, and that their relationship was not and had not ever been *Page 754 
romantic. Also, although the victim testified that the appellant appeared to be jealous when she talked to another male at the strip club, the appellant testified that he did not remember an argument at the strip club. Therefore, this factor weighs against a finding that the victim and the appellant were in a dating relationship.
Fifth, we must determine whether the parties demonstrated an affirmation of their relationship before others by statement or conduct. Again, the testimony provided little or no evidence that either the victim or the appellant had affirmed a relationship before others. Although the appellant contended that the victim was upset about him talking to another female at the strip club, the victim testified unequivocally that she and the victim were not boyfriend and girlfriend, that they had not ever dated, and that their relationship was not and had not ever been romantic. Also, although the victim testified that the appellant appeared to be jealous when she talked to another male at the strip club, the appellant testified that he did not remember an argument at the strip club. Finally, the record does not include any evidence that this is a case in which the victim and the appellant were in a secret dating relationship. Therefore, this factor weighs against a finding that the victim and the appellant were in a dating relationship.
Sixth, we must determine whether there are any other reasons unique to the case that support or detract from a finding that a "dating relationship" exists. The record in this case does not include any other evidence that would support or detract from a finding that the victim and the appellant were in a dating relationship.
Examining the totality of the circumstances of this case in light of the factors set forth in Hobdy, the evidence did not establish that the appellant and the victim were in a dating relationship. The dissent asserts that the trial court could have reasonably concluded that the appellant and the victim were in a dating relationship based on their social interactions over a two-year period and based on the appellant's jealousy when he saw the victim talk to another man while they were out at a strip club together. Noting that "[t]he trial court was presented with evidence from which conflicting inferences could be drawn as to whether [the appellant] and the victim had a `dating relationship'"; that "[i]t was for the trial court to make the necessary inferences from the evidence and the credibility determinations with respect to the witnesses' testimony that would underpin its findings and judgment"; and that "it is not the province of this Court to reweigh evidence that was presented to the trial court oretenus in a nonjury case," the dissent states that it would affirm the trial court's judgment. 960 So.2d at 756. Contrary to the dissent's assertions, the record does not support the inference that the trial court concluded that the appellant and the victim were in a dating relationship based on their social interactions over a two-year period and the appellant's jealousy. Rather, as we have previously noted, it appears from the trial court's comments at the end of the proceeding that it found the appellant guilty of third-degree domestic violence based on harassment simply because he and the victim had sexual relations the night they met. The purpose of the domestic violence statutes is to protect a specific class of victim by providing enhanced penalties. Such victim-specific crimes must be narrowly interpreted if we are to reflect their intended purpose. We cannot include in the specific category of "dating relationship" all sexual encounters no matter how infrequent or remote. To do so would be a disservice to the victims *Page 755 
intended to benefit from the domestic violence statutes.
 "We do not contest the judge's assessment of the [victim's] credibility in the present case, but rather his misapplication of the [factors set forth in Hobdy]. See Commonwealth v. Boucher, 438 Mass. 274, 276, 780 N.E.2d 47 (2002) (`we will not substitute our judgment for that of the trier of fact. We do, however, scrutinize without deference the propriety of the legal criteria employed by the trial judge and the manner in which those criteria were applied to the facts').
 "The judge committed an error of law in relying on improper factors as the basis for his finding that the parties were engaged in a `. . . dating relationship.'"
C.O. v. M.M., 442 Mass. 648, 655-56, 815 N.E.2d 582,589 (2004). For the reasons set forth herein, the evidence was insufficient, as a matter of law, to establish that the appellant and the victim were in a dating relationship. Therefore, we reverse the trial court's judgment as to the third-degree domestic violence conviction.
Nevertheless, the evidence clearly supported a conviction for the lesser included offense of harassment. "Appellate courts have the `inherent authority to reverse a conviction while at the same time ordering an entry of judgment on a lesser included offense.' Edwards v. State, 452 So.2d 506, 507
(Ala.Crim.App. 1983), aff'd, 452 So.2d 508 (Ala. 1984)."Campbell v. State, 555 So.2d 252, 254 (Ala.Crim.App. 1989). Accordingly, we remand this case to the trial court with instructions that it set aside the appellant's third-degree domestic: violence conviction and that it enter a judgment of guilty of the lesser included offense of harassment and impose a sentence for that offense. The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 28 days after the release of this opinion. The return to remand shall include a transcript of the sentencing hearing and the new sentencing order.
REVERSED AND REMANDED WITH INSTRUCTIONS.*
McMILLAN, P.J., and COBB and WISE, JJ., concur; SHAW, J., dissents, with opinion.
* Note from the reporter of decisions: On December 15, 2006, on return to remand, the Court of Criminal Appeals affirmed, without opinion.